THE SOCIETY FOR THE PROPAGATION OF THE GOSPEL IN FOREIGN PARTS PLAINTIFFS *vs.* THE TOWN OF PAWLET AND OZIAS CLARKE.

Ejectment to recover a lot of land, being the first division lot laid out to the right of the society in the town of Pawlet. The plaintiffs are described in the writ as " The Society for the Propagation of the Gospel in Foreign Parts, a corporation duly established in England within the dominions of the king of the United Kingdom of Great Britain and Ireland, the members of which society are aliens, and subjects of the said king." The defendants pleaded the general issue of not guilty. The general issue admits the competency of the plaintiffs to sue, in the corporate capacity in which they have sued.

If the defendants meant to insist on the want of a corporate capacity in the plaintiffs to sue, it should have been insisted upon by a special plea in abatement or bar. Pleading to the merits, has been held by this court to be an admission of the capacity of the plaintiffs to sue. The general issue admits, not only the competency of the plaintiffs to sue, but to sue in the particular action which they bring.

In the record there is abundant evidence to establish the right of the corporation to hold the land in controversy. It is given to them by the royal charter of 1761, which created the town of Pawlet. The society is named among the grantees, as " The Society for Propagating the Gospel in Foreign Parts ;" to whom one share is given. This is a plain recognition by the crown of the existence of the corporation, and of its capacity to take. It would confer the power to take the land, even if it had not previously existed.

The statutes of limitation of Vermont interpose no bar to the institution by the Society for the Propagation of the Gospel, &c. of an action for the recovery of the land in controversy.

The plaintiffs are a foreign corporation, the members of which are averred to be aliens, and British subjects ; and the natural presumption is, that they are residents abroad.

The act of the legislature of Vermont, which prohibits the recovery of mesne profits in certain cases, applies to the claims to such profits by the plaintiffs in this suit ; and the provisions of the treaty of peace of 1783, and those of the treaty with Great Britain in 1794, do not interfere with the provisions of that act. The law has prescribed the restrictions under which mesne profits shall be recovered ; and these restrictions are obligatory on the citizens of the state. The plaintiffs take the benefit of the statute remedy to recover their right to the land ; and they must take the remedy with all the statute restrictions.

THIS cause was certified to this court from the circuit court of the United States for the district of Vermont ; the judges of that court being opposed in opinion on certain questions of law which arose at the trial.

The action was an ejectment, brought to recover " the

first division lot laid out to the right of said society in Pawlet, containing fifty acres."

The cause was tried at October term 1828; and after the testimony on both sides was closed the jury were discharged, upon the disagreement of the judges of the court, on the several points herein stated, arising upon the facts agreed in the case, and stated by the counsel for the parties. The facts agreed were,

On the 26th day of August 1761, George III., then king of Great Britain, by Benning Wentworth, Esq. governor of the then province of New Hampshire, made the grant or charter to the town of Pawlet aforesaid, particularly describing the boundaries thereof to the grantees, whose names are entered on said grant, their heirs and assigns for ever; to be divided to and among them, into sixty-eight shares. Among the grantees whose names are entered in the said charter, is ' one whole share for the Society for the Propagation of the Gospel in Foreign Parts.' A copy of the charter was filed among the proceedings.

And afterwards, on the 16th of April 1795, Ozias Clarke executed the counterpart of a lease to the selectmen of the town of Pawlet, for the time being, for and on behalf of said town, his heirs, executors, administrators and assigns, of the tract of land mentioned in the plaintiffs' declaration, described as follows, to wit: all that tract of land, situate, lying and being in Pawlet aforesaid, known and distinguished by being the first division fifty acre lot, laid out to the right known by the name of the Society, or Propagation Right, to have and to hold the demised premises, with the privileges and appurtenances thereto belonging, &c. from the 16th of April 1795, and onwards as long as trees grow and water runs;—his yielding and paying yearly, and at the end of every year, the sum of seven pounds, lawful money, &c. A copy of the lease was annexed, and made part of this case. And thereupon Ozias Clarke entered into the immediate possession and occupancy of the said lot of land, and has been ever since in the possession and occupancy of the same; and has paid the rent aforesaid to the town of Pawlet, yearly and every year since, at the rate of seven

pounds, equal to twenty-three dollars and thirty-four cents, for each year; and the town of Pawlet have received the said sum, as rent, yearly, from Ozias Clarke, and have applied the same for the benefit of schools in the town of Pawlet. And Edward Clarke, the father of Ozias Clarke, went into the possession of the lot in the spring of the year 1780; it not appearing that he had purchased any title thereto, and so continued in the possession thereof till the defendant entered.

The case agreed contains extracts from the minutes of the society, stating the proceedings thereof at their meetings in London relative to the land in Vermont, granted by governor Wentworth to the society. The first meeting was held on the 16th of July 1762, and these minutes show the measures adopted by the society relative to the lands, from that period down to 1810.

The proceedings on the 16th of July 1762 and the 16th of March 1764, show an acceptance of the donation; and a resolution that agents be appointed to take charge of the patents and warrants for the land, and for such other purposes as the interests of the society may require.

At a meeting of the society held December 17, 1773, the society agreed, that it be recommended to the society to empower Mr Cossitt to see that justice be done to the society, in the allotment of glebes, &c. in New Hampshire.

The society resolved to agree that a letter of attorney be sent to the governor of New Hampshire, empowering Mr Cossitt to act in behalf of the society with regard to these lands, and leaving blanks for other persons whom the governor may think proper to insert.

On the 20th of May 1785, a report was made to the society relative to their lands, and the meeting resolved, that the secretary do write to some one or more members of the church of England in each of the states of America, in which the society has any property, to take all proper care in securing said property; and further to inform such persons, that it is the intention of the society to make over all such property to the use of the episcopal church in that country, in whatever manner and form, after communication with the

several governments, shall appear to be most effectual for that purpose.

On the 16th of May 1794, an application was made to the society through the bishop of New York, by the episcopal convention of Vermont, requesting the society to convey, for the support of the episcopal church of that diocese, the land held by the society in Vermont, under grants from New Hampshire. The committee of the society made a report as follows:

The committee agreed in opinion, that the bishop of New York be assured of the society's readiness to concur in any measures which can forward the establishment of an episcopal church. But having considered that former applications have been made from the state of Vermont, differing in their intentions from the present, which were rejected by the society in May 1790; and at the same time Mr Parker of Boston, when he obtained a deed from the society for the conveyance of their lands in New Hampshire, had signified that he should not trouble them respecting Vermont, till he should know the operation of that deed; and having never since heard from Mr Parker on that subject, are of the opinion, that there is not sufficient ground for the society to execute the present deed.

At a meeting of the society on the 16th of November 1810, the secretary of the society was directed to obtain the fullest and most particular information respecting the nature and value of the rights of the society to the lands in Vermont, with the best means of recovering and rendering the same available.

In consequence of certain votes of the society, expressive of their intention to appropriate the avails of their lands in the state of Vermont for the use of the protestant episcopal church in that state, the convention of the church in that state made application to the society for the power of attorney: and the said society executed to the Right Rev. Alexander V. Griswold, bishop of the eastern diocese, and the other agents therein named, the power of attorney, dated December 5, 1816; a copy of which was annexed to the case.

The act of the legislature of Vermont, passed October 27, 1785, entitled an act for settling disputes respecting landed property; an act entitled an act for the purpose of regulating suits respecting landed property, and directing the mode of proceeding therein, passed November 5, 1800; also, the several acts to keep the acts last aforesaid in force for later periods than those contained in said act; an act passed November 15, 1820, entitled an act for the purpose of regulating suits respecting landed property, and directing the mode of proceeding therein; and all the statutes ever passed in Vermont, for the limitation of actions, and all the additions thereto, as found in the several statute books, including the act passed November 16, 1819, entitled an act repealing parts of certain acts therein mentioned; an act passed October 26, 1787, authorising the selectmen of the several towns to improve the glebe and society's lands, and an act in addition thereto, passed October 26, 1789; an act passed October 30, 1794, entitled an act directing the appropriation of the lands in the state, heretofore granted by the British government to the Society for the Propagation of the Gospel in Foreign Parts; and all other statutes of said state, that either party considers applicable to this case: are to be considered as a part of this case.

Upon the foregoing case, the opinions of the judges of the circuit court were opposed upon the following points:

1. Whether the plaintiffs have shown that they have any right to hold lands?

2. Whether the plaintiffs are barred by the three years' limitation in the act of the 27th of October 1785, or any other of the statutes of limitation?

3. Whether, under the laws of Vermont, the plaintiffs are entitled to recover mesne profits; and if so, for what length of time?

The case was argued by Mr Webster, for the plaintiffs; and by Mr Doddridge, for the defendants. Mr Doddridge also presented the written argument of Mr J. C. Wright, for the defendants; as did Mr Webster, an argument for the

[The Society for the Propagation, &c. *vs.* The Town of Pawlet, &c.]

plaintiffs, prepared by the counsel in the circuit court of Vermont.

For the plaintiffs it was argued : that it was not a point in issue, or on which the court divided in opinion, whether the plaintiffs were a corporation capable of suing in this form ; that being admitted by the plea of the general issue. Cited 10 Mod. 207. 1 Bos. & Pul. 10. 10 Co. Rep. 122, 126. 1 Saund. Rep. 340, 342. Atlantic Insurance Company *vs.* Conard, 1 Peters's Rep. 395, 408, 560.

1. The plaintiffs contend, that if they are a corporation capable of suing, they must be capable of taking and holding land.

2. That the right to take and hold lands is incident to a corporation. Com. Dig. 258, F. 18, 260, F. 18, 19. Co. Lit. 2 a. 2. b. Sid. 162. Co. Rep. 30—36. Sir William Jones's Rep. 168.

3. That the corporation existed at and prior to the date of the charter of Pawlet, 1761.

It being admitted by the pleadings, that the plaintiffs are a corporation, there is no presumption against its prior existence, at any period within the time whereof the memory of man runneth, &c. Its prior existence is matter of general history, of which the court will take notice as matter of law.

The extracts from the records prove the existence of the corporation in 1762, by acts which refer back to the New Hampshire charters, as grants made to the corporation then existing. The preamble of the act of 1794, under which the defendants claim, recognizes all grants made to the society as made to an existing corporation.

" Whereas, the society for the propagation of the gospel in foreign parts, is a corporation, created by, and existing within a foreign jurisdiction, to which they alone are amenable ; by reason whereof, at the time of the late revolution of this and of the United States from the jurisdiction of Great Britain, all lands in this state granted to the society for the propagation of the gospel in foreign parts, became vested in this state," &c. The lease of the tenant admits, that the land in question was granted by said charter to the society.

The New Hampshire charter of the town, of 1761, recognizes the plaintiffs as then being an existing corporation. That charter, being a royal grant, by granting the lands to the plaintiffs, made them a corporation capable of taking and holding the lands thus granted, if they were not so before. Cited Dyer, 100. pl. 70. The Alderman of Chesterfield's case, Cr. Eliz. 35. 10 Mod. Rep. 207, 208. By the act of 1794, all grants of land to the society are recognized as grants originally valid, and so continuing until the revolution; by reason of which, the act declares the lands became vested in this state.

The state claims the right of the society as forfeited to the state, and grants the right to the town; and the tenant, in 1795, acknowledges the right of the town, by his lease, &c. and both are in under the act.

The plaintiffs contend that the defendants have admitted the right of the plaintiffs. See Atlantic Insurance Company vs. Conard, 1 Peters's Rep. 450. And are estopped from denying the original right of the plaintiffs at any time prior to the revolution. Cited 10 Johns. 353, 358, 292, 223. 12 Johns. 182. 3 Caines, 188. 2 Sch. & Lef. 73, 109.

The plaintiffs are not barred by the act of limitation of 27th October 1785.

1. The plaintiffs contend that the statute gives no title; that it bars only the action, and not the right of entry; and that the bar has been avoided by entry of the town, and the leases between the defendants.

Clarke, the father of the defendant, entered before the 1st of October 1780, without colour of title, and (without considering the exception to the clause) the action was barred in 1788. In 1795, Clarke permitted the town to enter, (which the execution of the lease supposes) accepted a lease from the town, (this he acknowledges in the counterpart executed by him, and by the payment of rent) and thereby acknowledged the right of the town.

The statute bars only the remedy therein named. Bal. on Lim. 59. 2 Salk. 422. Bro. Parl. Ca. 67. Lord Raym. Rep. 741.

2. The defendants are estopped by their leases from

setting up this defence under this statute. The tenant, by accepting a lease, acknowledges the title of the landlord, and disclaims his own; and the town enter and lease expressly in virtue of their title under the act of 1794 : both parties recognize that as the only existing title.

The case must now rest on the title of the landlord ; and he cannot set up this title, as it would show title out of the landlord and in the tenant, which would be repugnant to the effect of the lease. And the tenant can set up no title against his landlord, on the ground that he can have no such title. Blight's Lessee *vs*. Rochester, 7 Wheat. 547. 6 Johns. Rep. 34. 1 Caines's Rep. 444. 2 Caines's Rep. 215. 3 Caines's Rep. 188. 2 Camp. Rep. 12, and notes. The plaintiffs' rights are saved by the ninth section of the act: " provided always, and it is hereby further enacted by the authority aforesaid, that *this act* shall not extend to any person or persons settled on lands granted or sequestered for public, pious, or charitable uses."

1. The plaintiffs contend that the words " this act," ex vi termini, extend to the whole act. 2. That the proviso can only be limited by construction ; and that statutes of limitations are construed strictly to save the rights of the legal owner, especially an act limiting actions to two years and eight months, without any saving clause in favour of persons beyond seas. The statute 12th of Hen. VIII. c. 2, enacted that formedons in remainder and reverter should be brought within fifty years. It was holden not to extend to formedons in descender. Co. Lit. 115. Hargrave's notes, 148. 3. The restrictive construction would be unreasonable. The effect would be to give the settler no improvements, if sued for public lands on the 30th of June; but would give him the land, together with the improvements, if sued the next day. 4. No inference can be drawn from the location of this section ; for if it were conceded that the proviso of the fourth section extended only to the parts of the act relating to improvements, it would furnish no reason why a subsequent section of provisos should not extend to the whole act.

The fourth section is placed in the middle of those respecting improvements, and therefore must apply to what fol-

lows, as well as what precedes it. Besides, it will be found that this section applies to the clause of limitation also.

The counsel then went into a particular examination of the statutes of Vermont on the subject of limitations: and contended, that the construction of the whole act of the 27th of October 1785 is; that when a person entered into possession of lands of another, to which he had purchased a title, supposing at the time of the purchase such title to be good in fee, he shall be entitled to recover of the owner the value of the improvements and one half of what said lands are risen in value; and shall be quieted in possession of the lands, if he remains till after the 1st of July 1788, without suit against him.

That if he entered without a supposed title, he shall be entitled to recover the value of his improvements; but he shall have no allowance for the rise of the land. But if, by the proviso in the fourth section, he entered after the 1st day of October 1780, he shall not be entitled to recover for his improvements; nor be protected by the clause of limitation. And, if he entered after the 1st day of July, without legal title, he could not recover improvements; nor be protected by the clause of limitation.

And if he got possession at any time by actual ouster of the legal owner, according to the fourth section, or had "settled on lands granted or sequestered for public, pious, or charitable uses;" or had got the possession of lands by virtue of any contract with the legal owner, according to the ninth section; he could not recover for improvements, nor be protected by the clause of limitations.

He denied that the construction contended for by the defendant was correct.

1. From the history of the act. 2. That it is contrary to the intention of the legislature, as shown by a particular examination of the laws relative to limitations. 3. From the acts of the legislature; exempting the public rights from the grand list of the state, from which all annual taxes are made up for the support of government, schools, high ways, the poor, &c.

2. The defendants are not protected by the general statute of limitations passed the 10th of March 1787. This statute has no operation upon any case where the cause of action has accrued before the passing thereof. The words of the statute are: " no act of ejectment, &c. shall hereafter be sued, &c. for the recovery of any lands, &c. where the cause of action shall accrue after the passing of this act ; but within fifteen years next after the cause of action shall accrue to the plaintiff or demandant, &c. Has. Ed. of the Stat. 100, 101.

But what is very decisive of this question is, that both the general statutes of limitations above referred to, contain a proviso in favour of infants, &c. and persons beyond seas. The statutes, therefore, have never commenced running against the plaintiffs in this case, they having always been beyond seas.

The plaintiffs then contend that they are entitled to recover the seisin and possession of the lands, because : 1. The cause of action had accrued before either of the statutes of limitation had passed, and is therefore not with the enacting clauses. 2. If it was, still the right of the plaintiffs is saved under the proviso to protect the lands granted for public, pious, or charitable uses. 3. Because the plaintiffs always have been, and still are, beyond seas.

The plaintiffs are entitled to recover for mesne profits.

At common law, an action of trespass, after recovery in ejectment, was the proper action to recover the mesne profits, and such other damages as the plaintiffs had sustained. Run. on Eject. 156, 157. Bul. N. P. 87. 3 Wil. Rep. 121. An action for the mesne profits was consequential to the recovery in ejectment. Aslin *vs.* Parker, 2 Bur. Rep. 668.

The common law of England was adopted by statute so far as is not repugnant to the constitution, or to any act of the legislature. See Has. Ed. 28. The form of the English action was adopted by statute ; and was the only form used till the statute of 1797. Has. Ed. p. 196. And upon recocovery, the action of trespass was the only action used to recover mesne profits and any other damages: for in the action of trespass, the plaintiff was not confined to the mesne

profits only; he was entitled to recover for any damages which the defendant had done to the premises; such as cutting timber, or injuring or pulling down buildings, or removing fixtures, &c. Costs in ejectment were recovered as damages in the action of trespass. 2 Bur. Rep. 665.

The court say that damages may be recovered to four times the amount of the mesne profits. 3 Wils. Rep. 121.

It remains to inquire, for what length of time we are entitled to recover.

1. We contend, that as the action itself is within provisos protecting the plaintiffs from the operation of the statutes of limitation, it extends to all the incidents of the action in which the land itself is recovered, and consequently will go back to the first entry of the defendant.

2. If not, the plaintiffs are entitled for fifteen years before the commencement of the suit. The action of ejectment generally is limited to fifteen years; and that time in all cases would regulate the other incidents of the action.

The reason why, that at common law there could be no recovery beyond six years, is because the damages must be recovered in an action of trespass, and that action was limited to six years.

The statute of 1797 merely changed the remedy to the form now used. Comp. L. 84. Toll. Ed. 90, 91. By this statute, the plaintiff is entitled to recover as well his damages, as the seisin and possession of the premises. Under this statute, the plaintiff is entitled to recover for the same injuries, and to the same amount, as before the alteration he was entitled to recover in the action of trespass. The first restriction upon such recovery was introduced by a statute passed November 5th 1800; Toll. Ed. 211. Comp. L. 176; by the third section of which it is enacted, "that in all actions of ejectment which now are, or hereafter may be brought, the plaintiff, &c. shall recover nothing for the mesne profits, except upon such part of said improvements as were made by the plaintiff or plaintiffs, or such person or persons, under whom he, she or they hold." By the fifth section it is provided, "that this act shall not extend to any person or persons in possession of any lands granted for

public or pious uses;" and by the eighth section, " this act shall not extend to any person or persons, who shall enter upon and take possession of lands after the passing of this act."

It follows, therefore, that as the defendants are upon lands appropriated to public, pious, and charitable uses, that they are not entitled to the benefit of this provision of the act. It follows, also, that, as this provision of the act can operate only upon cases that had taken place before the passing of the act, it is wholly retrospective and void. See 2 Gal. Rep. 139. 7 Johns. Rep. 477.

Mr Doddridge, for the defendants, argued :

1. The plaintiffs have shown no capacity to recover these lands, or to hold them. They have offered no evidence of a charter of incorporation, constituting them a body politic ; or any act of incorporation authorising them to institute this suit. This is essential to the commencement of the suit; and the plaintiffs, for want of such proof of their existence as a corporation, have failed *in limine*.

The rule of law is, that every person, natural or artificial, who would avail himself of a deed or take any benefit by it, must produce the deed itself. 10 Coke, 92, a. b. And this rule prevails, without exception, in relation to charters or other acts erecting bodies politic. Without such a charter they can have no legal existence. Page's case, 1 Coke, 52. Rex *vs*. Passmore, 3 Term Rep. 247. 8 Coke, 8. Coke Lit. 225. 8 Johns. Rep. 295. Lord Raym. 1535. Kyd on. Corp. 292. Bul. Nisi Prius, 107.

Before any corporate act can be given in evidence, its charter must be produced. United States *vs*. Johns, 4 Dall. 412.

It has been supposed that the existence of the society having become matter of history, it is unnecessary to show the court its corporate character and capacity by producing the act of incorporation.

The distinction between such facts as may or may not be proved by history, is well settled. Those which are of

general concern, which affect nations, as the revolutions of governments and the succession of princes, may be proved by history. But the evidence of a private right, as a custom; or of a corporation, which is of much less notoriety than a custom, cannot be so proved. 1 Salk. 281.

Is it assumed by the plaintiff that the existence of this society as a corporation is acknowledged by the royal grant of the town of Pawlet, made by governor Wentworth, in 1761.

Is it true that a royal grant of land to an indefinite number of individuals, by a general description, is of itself to be received against strangers as evidence of the corporate capacity of the individuals? This court, in Pawlet *vs*. Clarke et al. 9 Cranch, 172, determined such a grant to be void.

The doctrine urged by the plaintiff is conceived to be without authority, and contrary to the whole theory of " king's grants." The king's grants shall not enure to any other intent than that which is precisely expressed in the grant. 2 Bl. Com. 347.

Is it true that the right to hold lands is legally incident to a corporation? This is denied. A corporation can only act up to the end or design, whatever that may be, for which it was created by the founder. 1 Bl. Com. 480. Corporations cannot be seised of lands for the use of another. Bacon on Uses, 347. 1 Bl. Com. 477. The cases cited for the plaintiffs, of the effect of a grant of lands by the king to a corporation, do not sustain the principle.

It is alleged that the general assembly of Vermont, by several legislative acts, have recognized all grants made to the society, as made to an existing corporation.

None of the acts of the legislature recognize the right of any foreign company to take or hold land. The interference of the assembly was for purposes entirely distinct, if not adverse to such recognition.

The acts of Vermont are founded on the supposition that these lands are vacant, and in default of ownership needed the care of the legislature. Even the last act, which grants the lands to the towns in which they lie, for the use of schools, although it mentions them as having been granted to " the

Society for Propagating the Gospel in Foreign Parts," does not recite, affirm, or admit the fact of the incorporation of such society; much less its capacity to hold lands in perpetual succession.

But if it had done so, it would have left the question, for every practical purpose, where it found it. The state has no power over any foreign society or body whatsoever.

It is denied that an express declaration by the legislature, that the plaintiffs are a corporation and competent to sue, would have any operation. It has been settled in Vermont, on solid grounds, that it is not competent for the legislature to supply evidence to a party in a particular case. 1 Chip. Rep. 237. What is legal or pertinent evidence, is a question exclusively for the court to determine.

The legislature has power to create a corporation; but it has no power to create one within the realm of Great Britain.

Neither the people of Vermont, nor the defendants, have ever known any thing of the society but its name. Nearly seventy years ago the charter of this town of Pawlet, containing the lands sued for, was issued in the name of the king.

The town has been divided among the grantees. The forest has been felled, and the soil made fruitful by its owners. For fifty years, the defendant and his ancestors have peaceably possessed this land; now claimed by a supposed body of men of whom nothing is known. Men who have never attempted to locate the lands, who never improved it, possessed it, or ever claimed to possess it.

Recently, certain persons in this county, not pretending to be of the society, have required the occupant of the soil, who has so long cultivated and improved the lands, to yield them to a foreign corporation; of whose capacity or right they know nothing, and of which they pertinaciously refuse to exhibit any evidence. May not the validity of a claim so circumstanced be well doubted? Does not the legal suspicion attach to the withholding of the charter; that if it was exhibited, it would develope circumstances fatal to the claim of the society?

Again, it is insisted, that the defendants cannot require

the production of this charter, because the town of Pawlet has taken possession of this property as having been the property of the society, and so continued until the revolution; described it as known by the name of " the society right;" and now claim it as forfeited by the revolution.

Where a party resorts to the admissions of his adversary, the whole admission must be taken together. Adopt this rule, and the title of the defendants is indisputable. If it is admitted that the land once belonged to a body corporate; the same statement asserts that it no longer belongs to it, but has been forfeited.

As to a legislative recognition, it cannot avail, if to enact facts for a particular case is contrary to law, and this is certainly so.

If it be said, that if the lands were not the property of the society, there would be nothing for the statute of Vermont to operate on; the answer is, that the words of the statute, which refer to " the society land" are descriptive, and no more.

It is not well supposed, that the defendants hold or claim to hold under a grant from Vermont. They are in peaceable possession of the land, and have held it for nearly half a century, under a legal and a fair title, as they believed : and on this they have a right to rest until a better right shall be made to appear by legal, competent and appropriate testimony.

It is an indispensable rule in ejectment, that the plaintiff must entitle himself to recover by the force of his own legal title; and he can derive no support from the weakness of his adversaries.

Evidence of title consists, 1. In showing possession and acts of ownership, from which the legal title may be presumed.

2. In proving a particular title. 2 Stark. on Ev. 514. He who claims as heir, must prove the seisin of his ancestor; and afterwards that he is heir. A guardian in socage, who has an interest in the land, must in ejectment prove that his ward is heir; that he is guardian; that his ward is then under the age of fourteen. 2 Stark. on Ev. 521. These

authorities show the error of the assumption that the defendants, having pleaded the general issue, admitted the right of the plaintiffs to sue as a corporation.

" The general issue," says sir William Blackstone, " is what traverses and denies at once the whole declaration." 3 Com. 306. How the denial of the whole can be construed an admission of a part, or any part of the right of the party, is not perceived.

It is agreed that temporary disabilities, which delay the suit only, cannot be relied upon under the general issue. It is only an admission that the party named may sue, not that he has a right to recover what he sues for : either in the way he sues, or in any other. His title to recover in all such cases depends on his proof. The non-joinder of all the parties in interest in a suit is fatal ; and yet the principle which is claimed for the plaintiff negatives this well established and proper rule. It is not an answer on the trial to the objection of want of parties, when the evidence of the plaintiff is given, showing that he is not the only party who can claim to recover ; that the general issue has been pleaded, and that all such objections have been waived. The spirit of the rule which is claimed in this case should go further to protect a plaintiff showing some right, although not the whole right, than to maintain that one can sue who has shown no right at all.

The case of Conard *vs.* The Atlantic Insurance Company, 1 Peters, 450, when examined, asserts nothi g contrary to the principles which are now stated. In that case, it is said by the distinguished and lamented judge who tried the case at the circuit court of Pennsylvania, judge Washington, that the object of the suit " was to try the merits of the case ;" and a technical objection taken to defeat the declared purpose of the parties, came in under no favcur.

If one sues as guardian, executor, or in any fiduciary character, the general issue does not confess his character, and he must prove it. So if an assignee sue, he must, on the general issue, prove the assignment. In this case the plea does not question the right of the plaintiff to sue : but as the plea denies every material allegation in the declaration, it

cannot admit they have title to the thing demanded; or capacity to acquire it; or any matter or thing touching the title.

It is urged that the defendants are estopped by the lease from disputing the capacity of the plaintiffs to take the land. A tenant, it is well said, is estopped to deny the title of his landlord; but the defendants are not tenants to the society. They have shown no title but possession, nor are they bound to exhibit any other, until some title is exhibited by the plaintiffs.

There is no privity of contract, action or interest, or relation between the plaintiffs and the defendant; and the doctrine of estoppels applies to such cases. What privity or relationship exists between the defendants and the pretended corporation. The very fact of capacity; which it is the object of the reasoning of the plaintiffs' counsel to infer or assume; should be proved by proper evidence, before any foundation is laid for inferences. It is required first to assume the corporate capacity of the plaintiff; then the relationship of the defendants to it, to estop the defendants' denial. Such assumptions are not warranted by the law, or by the facts of the case.

If the facts were as the plaintiffs assume, they do not form a legal estoppel, and prevent the defendant from a denial of the capacity of the plaintiffs to sue for these lands or to hold them.

Every estoppel ought to be reciprocal; that is, to bind both parties. 3 Coke, 352.

The name given to the land in the lease " known by the name of the society or propagation right," is not the name in which the plaintiffs declare; it may be as well appropriated to one society as to another.

Upon the statutes of limitations, it is contended; that the plaintiffs are barred of their right of action, should the court consider that they have established a capacity to maintain their suit.

Under the provisions of the act of 1785, the defendant is fully protected. The record shows that the father of the defendant entered on the land in the spring of 1780, and

continued in possession until April 1795, when his son entered, and has ever since continued in the possession of the land. It is fairly to be inferred, that Ozias Clarke came into possession under his father. And, thus, a possession of upwards of forty years is made out; a length of possession undisturbed, which entitles the party to the most favourable consideration. On the 10th of March 1787 the legislature passed the quieting act; which, it is admitted, does not embrace this case: but it is referred to in order to show the existence of a general disposition in the legislature to impose limitations on all titles derived from the mother country. It was doubtless the intention of the legislature, that the alarm as to titles growing out of the revolutionary struggle should be allayed, and that the holders and occupants of lands, so situated, should be speedily quieted in their titles; and their titles made complete, under the special legislation, growing out of the exigencies of the times. The rights of these parties, we therefore contend, vested under these laws, and no subsequent laws can divest them. The laws thus made constituted a contract on the part of the state; so far, at least, as that the title vested under the laws should not be divested by a repeal or change of the law of limitations.

The plaintiffs contend, that the last proviso, save one, in the quieting act, exempts the society from the limitations of the last section.

On the part of the defendants, it is urged that this proviso applies only to the previous part of the law; and by its position, as well as its purpose, is so restricted. Should it have the operation claimed for it by the plaintiffs, it will entirely defeat the purposes of the statute.

The act of 1795 consists of two distinct and independent parts, the subjects of which bear to each other no affinity or connexion; no more than if the legislation upon them was in two distinct laws. A particular examination of the sections of the law fully supports this position.

Sound principles of construction, and the requirements of justice determine, in order to attain the intention of the legislature, that the two parts of the statute be treated as se-

parate and distinct ; as much so as if contained in two statutes.

Separate statutes, or several statutes upon the same subject, are to be considered as one subject, for the purpose of interpretation. 1 Bur. 447. So if two distinct matters be embraced in one statute, they shall be considered as two acts. 7 Bac. Ab. 551. Hob. 226. Perkins, 13, 14.

The act of limitations of 1785, it is contended, is the only one applicable to the case; and it has no exception in favour of persons " beyond sea." Those words in the law of 1787 have nothing to do with this controversy.

But if they had, this is in the nature of an exception to the statute, and it is to be proved by him who would take advantage of it. That these corporations were beyond sea is not proved; and it is not to be presumed.

This court has determined, that to give the court jurisdiction, you may look back of the corporation, and must find, in case the jurisdiction is claimed between citizens of different states, that none of the corporators are citizens of the same state with that of the adverse party.

It is contended, that the statute of limitations does not apply, because the entry of the defendants, and those under whom they claim, was upon a supposed title. This is denied. The defendant, Clarke, is in possession; and this is all that can be required of him until the plaintiffs have shown their title. The terms of the act clearly embrace the case of the defendants; and the plaintiffs have made out no case of exception. It is understood that the decisions of the courts of Vermont on this statute have always been according to the literal meaning of the law.

It is denied that the act of 1801, by excepting lands of the description of those claimed by the plaintiffs, reserves the remedy for the recovery of these lands. The argument, that no subsequent statute could affect rights acquired under a precedent law, has already been submitted ; and it is also said with confidence, that the court will not admit that a repeal of the prior law was intended by implication. The act of 1805 is considered as in full force in Vermont, and many titles depend upon it.

Are the plaintiffs entitled to recover mesne profits, and for what time.

There is a strong analogy between the limitation of actions for the recovery of the land, and for the recovery of mesne profits.  At common law there could be a recovery for a longer period than six years.

In England, where the right to recover for mesne profits was first established, the defendants had probably been, in all the cases, occupants of improved land.  In this case, the claim of the plaintiffs is for the mesne profits of land which when first possessed was in a state of nature, and which has been made productive by the industrious improver.  Every principle of justice would require that a claimant under a long dormant title, should not have a compensation for an occupancy which had conferred upon the property such additional value.

In accordance with these principles, the legislature of Vermont have acted ; and while on the one hand they have secured to the occupant the value of his improvements, on the other they have denied to the successful claimant any supposed profits of lands, unimproved when the occupation of the defendant commenced.  Act of the legislature of Vermont, the 15th of November 1820.

This action was commenced in 1824, and is clearly within the provisions of this act; and there is nothing in the distinction as to the title under which the defendants held.

It would seem to have been the manifest intention of the legislature of Vermont, while it denied the occupants without supposed title the value of their improvements, to relieve them from liability for mesne profits ; to which, being benefited by the improvements which the party recovering the land takes without compensation, he could have no just claim.

Mr Webster in reply.

As to the capacity of the plaintiffs to take and hold the lands :  The capacity in which they act is admitted in the pleadings.  They sue as a corporation, and they are by the plea of the general issue admitted to be such, and so to be

taken. The capacity of the corporation to hold lands is sufficiently proved by producing a grant of lands to it by the king himself. The difference between this case and that of the Town of Pawlet *vs.* Clarke, in 9 Cranch, is that the grant was there to the church of England, and not to a corporation.

The defendants claim under the act of 1794, which act admits the existence of the corporation, and of their capacity to take the lands.

The lease to the defendant from the town of Pawlet shows that he claims under the crown. The town claims under the state, and the state claims under the society, and the society hold under the crown. The state assert their right as successors to the society, on the occurrence of the revolution. Thus all parties claim under the crown, and all are bound by their acts.

As to the statute of limitations, he said that the act only barred the action, not the entry; and in 1794 the town of Pawlet actually entered in this very right. They entered as having acquired the right of the society, and holding under it.

The defendant, Clarke, admitted this right; he now holds the lands under it; and he cannot dispute the right; although he may deny that the right belongs to the plaintiffs, and may contend that it has passed to the town.

The defendant cannot set up any title but that under which he entered; and having entered under the town, that title and that alone can he set up; on that title only can he stand.

Mr Justice STORY delivered the opinion of the Court; Mr. Justice BALDWIN dissenting on the first point.

This cause is certified to this court, from the circuit court for the district of Vermont; upon certain points upon which the judges of that court were opposed in opinion.

The original action was an ejectment, in the nature of a real action, according to the local practice, in which no fictitious persons intervene; and it was brought in May 1824, to recover a certain lot of land, being the first division lot

laid out to the right of a society in the town of Pawlet. The plaintiffs are described in the writ as " the society for the propagation of the gospel in foreign parts, a corporation duly established in England, within the dominions of the king of the united kingdom of Great Britain and Ireland, the members of which society are aliens and subjects of the said king.". The defendants pleaded the general issue, not guilty, which was joined ; and the cause was submitted to a jury for trial. By agreement of the parties at the trial, the jury were discharged from giving any verdict; upon the disagreement of the judges upon the points growing out of the facts stated in the record. Those points have been argued before us; and it remains for me to pronounce the decision of the court.

The first point is, whether the plaintiffs have shown that they have any right to hold lands.

In considering this point, it is material to observe that no plea in abatement has been filed, denying the capacity of the plaintiffs to sue ; and no special plea in abatement, or bar, that there is no such corporation as stated in the writ(*a*). The general issue is pleaded, which admits the competency of the plaintiffs to sue in the corporate capacity in which they have sued. If the defendants meant to have insisted upon the want of a corporate capacity in the plaintiffs to sue, it should have been insisted upon by a special plea in abatement or bar. Pleading to the merits has been held by this court to be an admission of the capacity of the plaintiffs to sue. Conard *vs.* The Atlantic Insurance Company, 1 Peters's Rep. 386, 450(*b*).

But the point here raised is not so much whether the plaintiffs are entitled to sue generally as a corporation, as whether they have shown a right to hold lands. The general issue admits not only the competency of the plaintiffs to sue;

(*a*) Comyn's Dig. Abatement; E. 16. Mayor, &c. of Stafford *vs.* Bolton, 1 Bos. & Pull. 40. 1 Saunders's Rep. 340. Williams's Notes. 6 Taunt. Rep. 467. 7 Taunt. 546.

(*b*) See the case of Sutton Hospital, 10 Co. 30, b. Comyn's Dig. Franchise, F. 6, 10, 11, 15. Capacity, A. 2. See also Proprietors of Kenebeck Purchase *vs.* Call, 1 Mass. Rep. 482, 484. Mayor, &c. of Stafford *vs.* Bolton, 1 Bos. & Pull. 40. 1 Saunders's Rep. 340, note by Williams.

but to sue in the particular action which they bring.   But in the present case, we think, there is abundant evidence in the record to establish the right of the corporation to hold the lands in controversy.   In the first place, it is given to them by the royal charter of 1761, which created the town of Pawlet.   Among the grantees therein named, is " the society for the propagation of the gospel in foreign parts," to whom one share in the township is given.   This is a plain recognition, by the crown, of the existence of the corporation, and of its capacity to take.   It would confer the power to take the lands, even if it had not previously existed.   And the other proceedings stated on the record, establish the fact that the society had received various other donations from the crown of the same nature; and had accepted them. Besides, the act of 1794, under which the town of Pawlet claims the lands, distinctly admits the existence of the corporation, and its capacity to take the very land in controversy.

" Whereas," says the act, " the society for the propagation of the gospel in foreign parts is a *corporation* created by and existing within a foreign jurisdiction, to which they alone are amenable; by reason whereof, at the time of the late revolution of this and of the United States from the jurisdiction of Great Britain, all lands in this state, granted to the society for the propagation of the gospel in foreign parts, became vested in this state, &c."

And the act then proceeds to grant the right of the state, so vested in them, to the various towns in which they are situated.   So that the title set up by the state is under the society, as a corporation originally capable to take the lands, and actually taking them; and their title being divested, and vesting in the state by the revolution.   In the latter particular the legislature were mistaken in point of law. This court had occasion to decide that question, in The Society for the Propagation of the Gospel in Foreign Parts *vs.* The Town of New Haven, 8 Wheat. 464; where it was held that the revolution did not divest the title of the society, although it was a foreign corporation.   That case came before us upon a special verdict, which found the original charter of the society granted by William the Third, and

its power to hold lands, &c.   We do not, however, rely on that finding, as it is not incorporated into the present case. But we think the other circumstances sufficient, prima facie, to establish the right of the society as a corporation to hold lands; and particularly the lands in question.  In Conard *vs.* The Atlantic Insurance Company, 1 Peters's Rep. 386, 450, the court held evidence, far less direct and satisfactory, prima facie evidence of the corporate character of the plaintiffs.   A certificate ought accordingly to be sent to the circuit court in answer to the first question; that the plaintiffs have shown that they have a right to hold the lands in controversy.

The second point is, whether the plaintiffs are barred by the three years' limitation in the act of the 27th of October 1783, or any other statute of limitations of Vermont.

The act of 1785 recites in the preamble, that many persons have purchased supposed titles to lands within the state; and have taken possession and made large improvements, &c. It then proceeds to provide in the first eight sections, for the allowance of improvements, &c. to the tenants, in cases of eviction under superior titles.   There is a proviso which prevents these sections from extending to any thing future. The ninth section is as follows : " provided always, and it is hereby further enacted by the authority aforesaid, that this act shall not extend to any person or persons settled on lands granted or sequestered for public, pious, or charitable uses ; nor to any person who has got possession of lands by virtue of any contract made between him and the legal owner or owners thereof."   The tenth section provides, that nothing in the act shall be construed to deprive any person of his remedy at law against his voucher.   The eleventh and last section is as follows : " that no writ of right or other real action, no action of ejectment or other possessory action of any name or nature soever, shall be sued, prosecuted or maintained for the recovery of any lands, tenements or hereditaments, *where the cause of action has accrued before the passing of this act ;* unless such action be commenced within three years next after the 1st of July in the present year of our lord, 1788."

Now, in order to avail themselves of the statute bar under this last section, it is necessary for the defendants to show that the cause of action of the plaintiffs accrued before the passing of that act. To establish that, it is necessary to show that there had been an actual ouster of the plaintiffs, by some person entering into possession adversely to the plaintiffs. No such ouster is shown upon the facts. It is, indeed, stated, "that Edward Clarke, the father of the said Ozias Clarke, went into possession of the said lot in the spring of the year 1780, it not appearing *that he had purchased any title thereto;* and so continued in possession thereof until the said defendant entered as aforesaid;" that is under the lease of the town. Edward Clarke is therefore to be treated as a mere intruder, without title ; and no ouster can be presumed in favour of such a naked possession. And it is not unworthy of notice, that the fourth section of the act of 1785 provided " that no person, who hath ousted the rightful owner, or got possession of any improved estate by ouster, otherwise than by legal process, shall take any advantage or benefit by this act." So that a plain intention appears on the part of the legislature not to give its protection to mere intruders, who designedly ousted the rightful owners.

It is also to be considered that the defendants do not assert any claim of title under him or in connexion with him ; and the other circumstances of the case lead to the presumption, that he never set up any possession adverse to the society's rights ; for the possession was yielded without objection to the town, when the act of 1794 enabled the town to assert a title to it.

The act of 1785, being then in terms applicable only to cases where the cause of action accrued before the passing of that act, cannot govern this case where no such cause existed. There is, moreover, another difficulty in setting it up as a bar, if the proviso of the ninth section extends, as we think it does, to every section of the act. It has been argued by the counsel for the defendants, that the ninth section ought to be restricted in its operation to the eight preceding sections. But we see no sufficient reason for this. The words are "that this *act* shall not extend," &c. ; not that

the prior sections of this act shall not extend, &c. It would be strange, indeed, if the legislature should interfere to prevent any improvements being paid for, in cases of lands granted or sequestered for public, pious, or charitable uses; and yet should allow so short a period as three years to bar, for ever, the right of the grantees for charity. There are good grounds why statutes of limitation should not be applied against grants for public, pious, and charitable uses; when they may well be applied against mere private rights. The public have a deep and permanent interest in such charities; and that interest far outweighs all considerations of mere private convenience. The legislature of Vermont has thought so; for we shall find, in its subsequent legislation, that it has by a similar provision excepted from the operation of all the subsequent statutes of limitation, grants to such uses. There is then no reason why the court should construe the words of the ninth section as less extensive than their literal import. The case ought to be very strong, which would justify any court to depart from the terms of an act; and especially to adopt a restrictive construction which is subversive of public rights, and justified by no known policy of the legislature. We feel compelled, therefore, to construe the words, that "this *act* shall not extend, &c." as embracing the whole act, and carving an exception out of the operation of the eleventh section of it.

Let us then see how far any subsequent statute of limitations of the state applies to the case. The next statute in the order of time, is the act of the 10th of March 1787, which provided as follows: "that no writ of right or other real action, no action of ejectment, &c. shall "hereafter be sued, &c. for the recovery of any lands, &c. where the *cause of action shall accrue after the passing of this act,* but within fifteen years next after the cause of action shall accrue to the plaintiff or demandant, and those under whom he or they may claim. And that no person having a right of entry into any lands, &c. shall hereafter thereinto enter but within fifteen years after such right of entry shall accrue." This act contained no provision excepting grants for public, pious, or charitable uses from its operation. But it contained

a proviso that the act should not extend to bar any infant, person imprisoned, or *beyond seas*, without any of the United States.    The act was prospective, and applied only where the cause of action accrued *after the passing of it*.    This act was superseded and repealed by another act of the 10th of November 1797, which constitutes the present governing statute of limitations of the state.    It contains, however, a proviso (sec. 13) that the act shall not be construed to extend to or affect any right or rights, action or actions, remedies, fines, forfeitures, *privileges, or advantages*, accruing under any former act or acts, clause or clauses of acts falling within the construction of that act, in any manner whatsoever; but that all proceedings may be had, and *advantages* taken thereon, in the same manner as though that act had not been passed; and that the former act or acts of limitation, clause or clauses of acts, which are or were in force at the time of passing the act, shall, for all such purposes, be and remain in full force.    This proviso preserved the operation and force of the act of 1787, as to causes of action accruing in the intermediate period between the act of 1787, and the act of 1797.

In this view of the matter, it is important to consider the entry of the defendant under the lease of the town, on the 16th of April 1795.    If that entry was adverse to the title of the plaintiffs, then the act of 1787 began to run upon it from that period; for the cause of action of the plaintiffs then accrued to them by the ouster.

It has been contended by the plaintiffs' counsel, that the entry of Clarke under the lease in 1795, was an entry for the plaintiffs, and in virtue of their title, and not adverse to it.    We do not think so.    The town of Pawlet claimed the right to the property, not as tenants to, or subordinate to the right of the plaintiffs ; but as grantees under the state. Their title, though derivative from, and consistent with the original title of the plaintiffs, was a present claim in exclusion of, and adverse to the plaintiffs.    They claimed the possession, as their own, in fee simple; and not as the possession of the plaintiffs.    A vendee in fee derives his title from the vendor; but his title, though derivative, is adverse to

that of the vendor. He enters and holds possession for him-self, and not for the vendor. Such was the doctrine of this court in Blight's Lessee *vs.* Rochester, 7 Wheat. Rep. 535, 547, 548. The lessee in the present case did not enter to maintain the right of the plaintiffs, but of the town. He was not the lessee of the plaintiffs, and acquired no posses-sion by their consent, or with their privity. This entry then was adverse to any subsisting title in them, and with an in-tention to exclude it. It was therefore, in every just sense, an entry adverse to, and not under the plaintiffs.

The case then falls within the act of 1787; and unless the plaintiffs are " beyond seas" within the proviso of that act, they would, upon the mere terms of that act, be barred. The facts stated upon the record, do not enable us to say whether there is absolute proof to that effect. The plain-tiffs are a foreign corporation, the members of which are averred to be aliens and British subjects; and the natural presumption is, that they are resident abroad. If so, there cannot be a doubt, that they are within the exception. If any of the corporators were resident in the United States, then a nicer question might arise as to the effect of the proviso; whether it applied to the corporation itself, or to the corporators, as representing the corporation. But this it is unnecessary to devise; and on this we give no opinion.

There is the less reason for it, because, by a subsequent act, passed on the 11th of November 1802, (long before the fifteen years under the act of 1787 had run,) it was provi-ded "that nothing contained in any statute of limitations heretofore passed, shall be construed to extend to any lands granted, given, sequestered or appropriated to any public, pious, or charitable uses; or to any lands belonging to this state. And any proper action of ejectment or other posses-sory action may be commenced, prosecuted, or defended for the recovery of any such land or lands, any thing in any act or statute of limitations heretofore passed to the contrary notwithstanding." This act of course suspended the act of 1787, as to all cases within its purview. That the grants to the society for the propagation of the gospel were deemed to be grants for pious and charitable uses within it, is ap-

parent from the subsequent legislation of the state, as well as from the objects of the institution. In November 1819 the legislature passed an act repealing this exception, so far as related to the rights " of lands in the state, granted to the society for the propagation of the gospel in foreign parts," thus plainly declaring that they were previously protected by it. This repeal cannot have any retrospective operation, as to let in the general operation of the statute of limitations in the intermediate period between 1802 and 1819; but must upon principle be held to revive the statute only in future. The present suit was brought in 1824, and the statute period of fifteen years had not then run against the plaintiffs.

It is unnecessary to enter upon the consideration of the statute of limitations of 1797, which contains similar provisions as to this subject with that of 1787, and the exception of persons " beyond seas." Charitable and pious grants were not excepted from its operation; but that defect was cured by an act passed on the 26th of October 1801, in terms similar in substance to those of the act of 1802, already referred to. The act of 1797, applies in terms only to future causes of action, to causes of action accruing after the passing of the act; and limits the action to the period of fifteen years. If it had applied to the present case, it would have been open to the same reasoning upon the exceptions, which have been already suggested in reference to the act of 1787.

Upon this second question our opinion is, that a certificate ought to be sent to the circuit court, that the plaintiffs are not barred by the three years' limitation, in the act of the 27th of October 1785, or by any other of the statutes of limitations of Vermont.

The next point is, whether, under the laws of Vermont, the plaintiffs are entitled to recover mesne profits; and if so, for what length of time.

Previous to the year 1797, the English action of ejectment was in use in Vermont, and the common law applicable to it, as well as the action for mesne profits consequential upon recovery in ejectment. By an act passed on the 2d of March 1797, the mode of proceeding was altered.

[The Society for the Propagation, &c. *vs.* The Town of Pawlet, &c.]

The suit was required to be brought directly between the real parties, and against both landlords and tenants ; and by that and a subsequent act, the judgment was made conclusive between the parties.    It was further provided, that in every such action, if judgment should be rendered for the plaintiff, he should recover, *as well his damages,* as the seisin and possession of the premises.    This provision has ever since remained in full force, and has superseded in such cases the action for mesne profits.    In November 1800, an act was passed, declaring, " that in all actions of ejectment which now are, or hereafter may be brought, the plaintiff shall recover nothing for the mesne profits, except upon such part of said improvements as were made by the plaintiff, or plaintiffs, or such person or persons under whom he, she or they hold."    The act contained a proviso, that it should not extend to any person or persons in possession of any lands granted for public or pious uses.    This act continued in force until November 1820, when an act passed containing the same general provision as to the mesne profits ; but the proviso in favour of lands granted to pious and charitable uses was silently dropped, and must be deemed to be repealed by implication.

The question then is, whether the act of 1820 does not take away the right to mesne profits in this case ; for the state of facts does not show that any improvements have ever been made by the plaintiffs.    The treaty of peace of 1783, the British treaty of 1794, do not apply to the case. The right of action, if any, of the plaintiffs, did not accrue until the year 1795.    The entry then made by the defendants was the first ouster : and at that time, in the action of ejectment, the plaintiffs could not have recovered any damages ; but would have been driven to an action of trespass for mesne profits.    The legislature was competent to regulate the remedy by ejectment, and to limit its operation.    It has so limited it.    It has taken away by implication the right to recover mesne profits, as consequential upon the recovery in ejectment, and given the party his damages in the latter action.    It has prescribed the restrictions upon which mesne profits shall be recovered; and these restrictions are obli-

gatory upon the citizens of the state. The plaintiffs have not, in this particular, any privileges by treaty beyond those of citizens. They take the benefit of the statute remedy to recover their right to the lands ; and they must take the remedy with all the statute restrictions.

Upon this last question our opinion is, that it ought to be certified to the circuit court, that under the laws of Vermont the plaintiffs are not entitled to recover any mesne profits ; unless so far as they can bring their case within the provisions of the third section of the act of the 15th of November 1820.

This cause came on to be heard on the transcript of the record, from the circuit court of the United States for the district of Vermont, and on the points or questions on which the judges of the said circuit court were opposed in opinion, and which points or questions were certified to this court for its opinion, in pursuance of the act of congress for that purpose made and provided, and was argued by counsel; on consideration whereof, it is ordered by this court, that it be certified to the said circuit court, on the points aforesaid, that this court is of opinion, 1. That the plaintiffs have shown that they have a right to hold lands, and especially the lands in controversy. 2. That the plaintiffs are not barred by the three years limitation in the act of the 27th of October 1785, or by any other of the statutes of limitations of Vermont. And, 3. That under the laws of Vermont, the plaintiffs are not entitled to recover any mesne profits, unless so far as they can bring their case within the provisions of the third section of the act of Vermont of the 15th of November 1820. All of which is accordingly hereby certified to the said circuit court of the United States for the district of Vermont.