EMERSON CO. OF WEST VIRGINIA v. NIMOCKS.

(Circuit Court, E. D. North Carolina. June 25, 1898.)

1. ACTIONS BY CORPORATIONS—PROOF OF CORPORATE EXISTENCE—WAIVER.
    Ordinarily, the question as to the corporate existence of plaintiff should be raised by plea in abatement, and, if defendant fully answers, the objection will be deemed waived.

2. SAME—PLEADING.
    An answer denying all knowledge of the corporation plaintiff or its creation or corporate existence amounts to a mere general denial, and is insufficient to raise an issue as to plaintiff's corporate existence.

3. EQUITY PROCEDURE—TAKING OF TESTIMONY WITHOUT LEAVE.
    Where an application for further extension of time to take testimony is refused, but the party, notwithstanding, gives notice and takes the testimony, the opposite party refusing to attend, the testimony so taken is no part of the record, and must be disregarded.

4. EXPERT EVIDENCE—MODE OF TAKING.
    Expert evidence read from typewritten sheets originally prepared by counsel alone, without any notes of the witness, and merely revised by the witness on the morning of testifying, without making material changes, is not entitled to great respect, even if the deposition is not suppressed.

5. PATENTS—VALIDITY—LUMBER DRIER.
    The Emerson patent, No. 535,982, for a lumber drier, is void for want of novelty and invention.

This was a suit in equity by the Emerson Company of West Virginia against Robert Mitchell Nimocks for alleged infringement of a patent for a lumber drier.

M. R. Walter, Stewart & Stewart, and Battle & Mordecai, for complainant.

F. N. Busbee, John W. Hinsdale, and Ernest Wilkinson, for defendant.

SIMONTON, Circuit Judge. Before entering upon the discussion of the merits of this case, two preliminary questions must be met and decided.

1. The complainant sues as a corporation, and in its complaint sets out the fact of its corporate existence. The defendant, in his amended answer, denies all knowledge, by information or otherwise, of the corporation, of its creation or present corporate existence of complainant. In taking the testimony in chief, no evidence was offered on this point by complainant's counsel, but when taking the testimony in rebuttal, omission having been discovered, the evidence was offered, and is in the record. Ordinarily, this objection, which goes to the person of the complainant, should have been taken by plea in abatement. 1 Daniell, Ch. Prac. (Perk. Ed.) 654. The defendant, having fully answered, may well be deemed to have waived this objection. Society for the Propagation of the Gospel v. Town of Paulet, 4 Pet. 480; Pullman v. Upton, 96 U. S. 329. If, however, it be concluded that the answer seeks to avail itself of a defense which could have been taken by plea, it does not accomplish this result. At the most, the answer amounts to a general denial. That will not raise this issue. U. S. v. Insurance Companies, 22 Wall. 100; Steamship Co. v. Rodgers, 21 S. C. 27; Association v. Read, 93 N. Y. 477. And above all, inasmuch as the omission to introduce the evidence in chief was an inadvertence of counsel, this will be excused, especially as the formal testimony is introduced before the taking of evidence has closed, and no possible harm could have come to defendant. Hood v. Pimm, 4 Sim. 101; Beach, Eq. Prac. § 549. See, also, Ryan v. Martin, 91 N. C. 464; Johnson v. Smith, 86 N. C. 498.

Another point must be noticed. The time for taking rebuttal testimony in this case on the part of complainant had been extended to July 21, 1897. On 6th September, 1897, application was made by complainant to the circuit court (Judge Purnell presiding), for further extension. This was refused. The application was renewed on 18th September following, and was again refused by Judge Purnell. Notwithstanding this refusal, the complainant went on and took the testimony of Jacob Ulman, which appears at large on the record. The counsel of defendant were notified of the intention to take this testimony, and of the time and place. They did not attend. It is no part of the record, and will be disregarded. It does not stand on the same footing as testimony taken without previous leave of the court, as in Coon v. Abbott, 37 Fed. 98, and Wenham v. Switzer, 48 Fed. 612. This testimony was taken despite the refusal of the court to allow it to be done.

One other question has been made in this case, important as one of practice. Just before closing the examination in chief of complainant's expert, Prof. Harry Fielding Reid, he was asked the question: "Just state in conclusion what you understand to be the invention of Emerson, as expressed in patent in suit No. 535,982." Replying to this question, he read his answer from typewritten sheets.

To this defendant objected. Upon cross-examination it appeared that these typewritten sheets were prepared by counsel for complainant in his office, not from any notes of the witness, and afterwards submitted to the witness on the morning of the examination. He revised them until they exactly represented his opinion on the subject. The original memorandum was produced, and the changes made by witness were shown. These did not change the memorandum in any material respect. Can this testimony be admitted? If an expert in a patent case had himself reduced to writing the result of his examination of a patent, and had then read it, this may not be objectionable. So much depends upon clear exposition of the thought and a careful use of words and sentences that previous consideration and preparation would help the examination. But when the paper is prepared by counsel, who is cognizant of the strength and weakness of his case, and whose dominant idea must be a plausible presentation of its merits and concealment of its demerits, who also prepares the paper without the restraint of his oath, a very different result follows. All men are prone to fall in with the current of thought in a clear and able presentation of a subject, and unconsciously to give their assent to that which is so well expressed. The course adopted here is perilously near a leading question. According to Greenleaf on Evidence (section 438), a lord chancellor indignantly suppressed a deposition made up by counsel from notes of the witness himself. And the weakness of all evidence offered in the shape of affidavit is that the testimony is by one given in the language of another. In the present case the evidence is that of an expert. It is an opinion. Its value is gauged by the weight to be given to the opinion. Delivered in this way, it loses very much of the respect which otherwise would have been given it. For this reason it is not stricken out.

The bill in this case is filed by the Emerson Company of West Virginia, a corporation, against Robert Mitchell Nimocks. It sets up the ownership by the complainant of patents, dated 19th March, 1895, numbered 535,981 and 535,982, tracing its title thereto, and charges that the defendant has infringed the same. In his answer, the defendant denies the originality of the invention claimed by the complainant; averred that it is controverted also by the Standard Dry-Kiln Company, which controversy is in litigation; that the defendant is using a kiln under contract with the Moore-Cain Dry-Kiln Company, and that the patents used by him were originally issued to La Fayette Moore, No. 524,598, 14th August, 1894, and 554,134, February 4, 1896. Subsequently, by leave of court, he filed an amended answer, in which, repeating the defenses in his original answer, he averred that the alleged invention and improvements of the patents claimed by complainant were covered by a number of other patents theretofore issued, setting them out in detail; that the improvements claimed by complainant were really made by La Fayette Moore; that they had been in public use years before; and that there was irregularity, prolixity, redundancy, and concealment in the descriptions and specifications under which the patents of complainant were obtained. The cause being at issue, a mass of testimony was taken, and it comes up for a hearing on the merits. During the taking of the testimony, counsel for complainant gave notice that he would not

rely upon patent No. 535,981 at all, and that he would rely only upon claims 2, 3, 5, 6, and 9 of patent No. 535,982.

The functions and advantages of this Emerson invention are thus described:

"This invention relates to an improved form of drying kiln, designed particularly for drying lumber, but useful in drying any other material by heated air; and the object of the invention is to construct a simple, durable, and inexpensive kiln, which will be effective in operation, economical in heat, and wherein sufficient moisture (derived from the substance of material being dried) will be automatically retained during the initial stages to keep the exposed surfaces of such substance or material from becoming too dry, and to maintain such surfaces in the best condition until the internal moisture therein has been extracted."

The invention is illustrated by a drawing which appears below, and is thus explained:

A represents inlets for cold air; B, B, air passage; C, opening to radiators and drying chamber; D, radiators; E, E, E, E, iron tracks for supporting cars; F, F, trucks for supporting material; G, G, material being dried; H, H, H, parts of the structure acting as deflectors for directing the current of heated air horizontally through the material. I is a perforated floor or walk way. J, J, are covers and walk ways for directing air through radiators. K, K, are spaces between walls of building and the material being dried. L, L, are receivers or separators out of line of upward current, in which the heavier portions of saturated air settle. M, M, is space for the heated portions of air to become separated and draft upward. N is the point where the heated air cushions and forms a return current. O, O, is the heavier portions of saturated air forming into an eddy, and separating. P, P, are ducts or siphons leading downward, carrying the moisture that has been separated by gravitation, and discharging it into the atmosphere. Q, Q, are adjustable covers at outlets of siphons. R, R, are walls of building packed with nonconducting material. S, S, are inner walls of building. T, T, are ducts or siphons leading downward from drying room into cold air chamber at U. V, V, is a floor above air passage. W, W, are walls to ducts or siphons. X, X, is distributing chamber beneath radiators. Y, Y, are landings at each side of kiln building, and connected to frame of kiln structure, and firmly braces it. z, z, is earth. a, a, is dry heated air, denoted by arrows. b, b, is partially saturated air; c, c, heated air that has not become fully saturated, and being retained in kiln.

The claims alleged to be infringed are as follows:

(2) A drying kiln having a drying chamber resting on a suitable base. and descending air passages having their upper parts open to receive the moist air from the said drying chamber, and provided with exits to the external atmosphere, said exits being located between the upper openings and the said base.

(3) A drying kiln having, in combination, a "drying chamber," means for supplying heat thereto, a false floor below the heater, a fresh air supply passage, B, below, the false floor communicating with the heating chamber, and a descending outlet passage for the delivery of moist air from the drying chamber to the passage, B, substantially as and for the purpose described.

(5) A drying kiln having in combination a drying chamber, descending air outlet passages, having their upper ends open to receive moist air from the said chamber, and provided with exits to the external atmosphere, and a lower down passage or chamber communicating with the said drying chamber, and with the base below said chamber, substantially as described.

(6) A drying kiln having in combination a drying chamber containing double tracks, so arranged as to provide vertical air circulating passages between the loaded cars upon the tracks in the drying chamber, means in the drying chamber for supplying heat, communications from the drying chamber extending down and below the means of supplying heat, and thence opening again into the drying chamber, and descending air outlet passages having their upper parts open to receive moist air from the drying chamber, and provided with exits to the external atmosphere, substantially as shown and described.

(9) A floor, V, V, with opening, C, to the air chamber, X, X, with the earth, z, z, beneath the said floor, forming an air passage for cold air, having inlets, A, the duct, T, for conducting the partially saturated air from the drying chamber to the said passage at U, U, substantially as described.

The first question is whether this be an invention over prior art. It seems to be admitted, as stated by Little, one of the complainant's witnesses, that there are upward of 1,300 patents for the drying of lumber and articles of similar nature. The purpose of each of these is to secure the circulation of hot air through the material to be dried (see Edwards' patent, No. 134,529; Ferins, 220,225; Wood, 245,911; Cole, 340,660); and the effort is to make such circulation as nearly automatic and continuous as possible. Many of these patents resemble the patent in question in very many important particulars. Hot air is applied below a chamber in which is placed the

material to be dried. It passes through this material absorbing the moisture in its passage, and ascends to the top of the kiln. Some of the patents provide for the escape of the heated air charged with moisture through a chimney or other opening in the roof. This causes as well a waste of the drying heat as the too rapid drying of the outer part of the material. Others have no aperture at all except the accidental openings or craneries in the structure. In these the heated air is kept within the building, and a circulation of the air is created, and the moisture is absorbed from the material to be dried. This is a slower process, and experience has shown that the result is imperfect. The material is not dried through, or it is dried too suddenly, and cracks. The device of the complainant was intended to remedy the defects in each of these plans. As is expressed in argument, to devise "a structure at once simple and stationary,—that is, having no moving parts,—inexpensive and effective, to dry the lumber by heating it and retaining the evaporated air so as to keep the lumber submerged in a moist atmosphere, and then, at the proper moment, to automatically discharge the moisture, and thoroughly dry the lumber, and to do all this quickly and with an economy of heat." Others had conceived the same idea, and had sought to obtain the same result. Van Osdel, 363,704; Morton & Andrews, 426,463; Moore, 524,598. The patent in question endeavors to accomplish this object by means of deflectors, base floor, tracks, trucks, and cold-air inlets. All these appear and are shown in prior patents in evidence. Leary's, No. 514,832; Rogers, 497,687; Moore, 524,598; Myers, 295,667. The novelty claimed by complainant is in providing overhanging separators or receivers, L, L, and the combination, arrangement, and location of the ducts, P, P, and, T, T. The whole theory of complainant's patent is that the heated air passing through the material to be dried, and absorbing the moisture in its passage, becomes heavier by reason of the moisture, and, as it is driven above the material, it descends by reason of its gravity in the duct, K, down through T, where it meets the outer atmosphere coming in at U, and its moisture is condensed. It then passes up again into the heating apparatus, through the material to be dried, and repeats the same operation. When the moisture has all been taken from the material, and so the air is lighter, the passage down K and T ceases, and the heated air goes out through P, to Q, into the outer air. In this operation, L, L, acts as a receiver or separating chamber. This theory that air, in absorbing moisture, becomes heavier, and, by force of gravity, will descend, is not sustained either in actual observation or in science. Kimbal, Prop. Cas. p. 89. Be this as it may. With regard to L, L, the experts for complainant and defendant concur in the opinion that they are unnecessary, and do not perform the function assigned to them. T, T, shows ducts which appear and have the same uses in Servoss' patent, No. 469,067. We are thus left to the position and arrangement of the ducts, P, P. The evidence shows that these ducts act simply as chimneys discharging the overheated air into the outer atmosphere. They thus perform the same function as the chimney in the roof of the earlier patents. The location at the side of these outlets checks the flow

of heated air and aqueous vapor. But the same result could take place with chimneys in the roof by the use of dampers. From this point of view there is no novelty in this patent. The complainant relies largely upon the function performed by these ducts, P, P, and their outlet, Q, Q; and it charges that the defendant has infringed his patent, because he has, under his patent of 1896, taken out as an improvement of his patent of 1894, No. 554,134, and has made openings in his structure, which it is charged perform the same function as P, P, with the outlets, Q, Q. But the preponderance of the evidence shows that while in the Emerson structure the air passes out of these openings, and none or scarcely any comes in, in the defendant's structure the outer atmosphere continuously comes into the kiln through his opening. Thus, it is demonstrated that P, P, with its outlet, performs the part of chimneys, while the opening of the defendant admit the outer air, instead of discharging air from the kiln. The length of this opinion forbids any further extended discussion of the case. The specifications accompanying the patent are confused, abound in the use of terms and in theories which evidently were not clearly understood by the draftsman. And in this they are calculated to mislead the public, both as to the character and the extent of the claim. Merrill v. Yeomans, 94 U. S. 568. There is no evidence of a convincing character of the utility of the invention; and, examining the exhibits in the case offered by complainant, it does not appear that any kilns have been manufactured in accordance with the patent. One exhibit offered by defendant (defendant's Exhibit No. 1), and shown to be an exact representation of the patent of complainant, is dissimilar in important details from the exhibits of complainant itself. The bill is dismissed.