No. 2.—ROBERT C. FAIN, plaintiff in error, *vs.* JAMES C. GARTH-RIGHT, defendant in error.

[1.] A demise in Ejectment cannot be stricken out, because the name of the lessor is used against his consent, if the plaintiff offers to indemnify him against all liability to loss or damages, and if the use of his name be necessary to the assertion of the plaintiff's rights.

[2.] A brings ejectment for land and holds B's deed, as part of his chain of title.  B is offered as a witness for the defendant, and is examined upon his *voir dire*, and says that he never made the deed under which the plaintiff claims—that he is the grantee from the State, and has never sold the land to any one but to the defendant—that he contracted to sell it to him, and took his notes for the purchase money, which he still holds, and gave him his bond for titles to be made when the purchase money was paid.   *Held*, that B is an incompetent witness for the defendant.   B was notified to appear and defend.

[3.] A certified copy of the record of commissions from the Executive Office, is the highest and best evidence of the fact that one who appears, from his acts, to have been a Justice of the Peace in a given county, during a particular time, was not a Justice of the Peace *during that time*.

[4.] A person who enters into possession of land, under a contract of purchase, with bond for titles when the purchase money is paid, is in possession under color of title, and his possession is adverse, although he has not paid the purchase money.

Ejectment, in Marion Superior Court.   Tried before Judge ALEXANDER, May Term, 1848.

The facts necessary to understand the decision of the Court, are embraced within it.

HILL & SCOTT, for plaintiff in error.

WORRELL, for defendant, cited, 4 *Term R.* 366.  2 *Stark. Ev.* 238.  1 *Phil.* 226.  1 *Cranch*, 117.  8 *Cow.* 611.  4 *John.* 140.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] This was an action of ejectment.   Two demises were laid in the declaration.   One from *Guilford Pullen*, and the other from *Robert C. Fain*.   *Pullen*, upon the trial of the cause upon the appeal, came into Court, and moved that his name, as lessor to the plaintiff, be stricken from the declaration, averring that it had

Fain *vs.* Garthright.

been inserted without his consent. The plaintiff objected, tendering to him such indemnity against liability in open Court, as the Court might direct ; and informing the Court that a deed from him was a material link in his title : which deed was produced. The Court ordered his name to be stricken, and thus fell the demise to plaintiff, from him. This decision being excepted to, is assigned for error. Without the offer of indemnity, this individual, we think, could not be retained as a party to this suit, against his will, with it—he could. No man has the right to use the name of a citizen without his consent, in such way as will subject him to loss or damage. This lessor, by being made a party, would be subjected to liability to costs. We know of no valid objection, as a general rule, to the use of a name, when that use is necessary or material to the successful prosecution of a party's rights, but the one suggested. If that is obviated by a sufficient indemnity, such as in the judgment of the Court will protect the individual from loss, such as was here tendered, then there can be no objection. I do not say that the name of a person may be used capriciously, in a case where it is not material for the assertion of the party's rights, or in cases where he is made a party merely to defeat the adversary ; as where he is a material and competent witness for the adverse party, even if indemnity is offered. But that, where it is apparent to the Court, that the use of a person's name is important to the rights of a party ; and such person is sufficiently indemnified, it is right and proper that he be made and retained a party. A contrary rule would preclude resort altogether, to a Court of Law, for the purpose of enforcing instruments not negotiable, and choses in action. A very numerous and very important class of persons—the assignees of choses in action, would be without a remedy in a Court of Law. I do not know that it has ever been questioned, that the person holding the legal title to choses in action, may be made a party by the assignee, for the purpose of collecting them.

There is a brief dictum of *Spencer, J.* in a case read from *New York*, to the effect, that the name of a lessor in ejectment, used without his consent may be stricken out. There he was held a competent witness, if not a party for the defendant; he was not indemnified, and it did not appear that his name was necessary for plaintiff's recovery. No motion was made—no judgment had.

If it were an analagous case to this, we would not hesitate to overrule it.

[2.] After striking the name of the *lessor Pullen,* he was tendered as a witness for the defendant. Being objected to, he was sworn on his *voir dire,* and stated that he had never executed the deed to the land under which the plaintiff claimed; that he was the grantee from the State, and had never sold the land but once; that he had sold it to the defendant, and had taken his notes for the purchase money, which he still held unpaid, and that he had given to him his bond for good and sufficient warranty titles, when the purchase money was paid; that he had been notified by the defendant to appear and defend the suit, and was then in Court for that purpose; and that he would not be in any event liable over to the plaintiff, on the deed which he held. The Court admitted him, and that is assigned also for error.

*Pullen* was clearly an incompetent witness, upon the ground of interest. He was called to support the defendant's title claiming under him. He had been vouched. It was his interest to defeat the plaintiff's recovery, because, if the plaintiff succeeded, he would be liable over to the defendant, upon his contract with him for the sale of the land. He was under bond to him, to execute to him good and sufficient warrantee titles. He occupied the position of a grantor to the defendant. The judgment of recovery for the plaintiff, could be used as evidence against him in a future suit, by the defendant against him, on his bond; or in defence of a suit by him on the notes for the purchase money. "Where the interest (says Mr. Greenleaf) of the witness arises from liability over, it is sufficient that he is *bound to indemnify* the party calling him, against the consequences of some fact essential to the judgment. It is not necessary that there should be an engagement to indemnify him generally against the judgment itself, though this is substantially involved in the other; for a covenant of indemnity against a particular fact, essential to the judgment, is in effect a covenant of indemnity against such a judgment. Thus the warrantor of title to the property which is in dispute, is generally incompetent as a witness for his vendee, in an action concerning the title. And it makes no difference in what manner the liability arises, nor whether the property is real or personal. If the title is in controversy, the person who is bound to make it good to one of the litigating parties, against the claim of the other, is identified in interest with that party, and therefore,

cannot testify in his favor." 1 *Green. Evid.* 466, 467. *Serle vs. Serle,* 2 *Rols. Ab.* 685. 21 *Viner Ab.* 362, *lit. Trial G. f. pl.* 1. *Steers vs. Carwardine,* 8, 6, *and p.* 670. 1 *Stra.* 445. 4 *Mass.* 441. 4 *Watts.* 308. 13 *Pick.* 460. 14 *Mass.* 245. 3 *Pick.* 284. 5 *Green.* 450.

If a vendor sell without covenant of warranty, or restricted to claims set up under himself, he is a competent witness for his vendee. *Last authorities.* The obligation of the bond in this case, is to make the defendant *good and sufficient warranty titles,* which is equivalent in its extent to a general covenant of warranty. The title to the land is a fact in issue ; in this suit its object is to try the title. It is against the loss of the title, that the bond is designed to protect the defendant. It is very clear that the witness is interested—if he by his testimony defeats the plaintiff's recovery, he loses nothing ; if he does not, he is liable to the defendant. If the effect of a judgment is to render him liable to costs only, he is incompetent, *( Lewis vs. Peake,* 7. *Taunt.* 153,*)* where he has been called upon to defend. To disqualify, the liability must be immediate—it must spring directly out of the judgment. Here it is immediate. *Clark vs. Lucas, M. & Ry.* 32. *Briggs vs. Crick,* 5 *Esp.* 99. *Martin vs. Kelly,* 1 *Stew. Alab. R.* 198. Nor is it necessary that the warranty be express—an implied warranty will disqualify. *Hurmance vs. Vernory,* 6 *Johns. R.* 5. *Hale vs. Smith,* 6 *Greenleaf,* 416. *Baxter vs. Graham,* 5 *Watts,* 418. It has been ruled, that one who has put the defendant in ejectment into possession under a contract to sell and convey, is not a competent witness for the defendant, and that is precisely this case. *Jackson, ex. dem. Roosevelt, vs. Stackhouse,* 1 *Cowen's R.* 122.

See farther upon the general proposition that a vendor is not competent to support the title of his vendee, when under a general covenant of warranty. *Swift vs. Dean,* 6 *Johns. R.* 523. 3 *Wend.* 240.

In reply, it may be said that the witness had made a deed, under which the plaintiff claimed as part of his chain of title, and if the plaintiff fails in the action, he will be also liable to him, and therefore his interest is balanced and he is a competent witness. The answer is, that the witness was sworn on his *voir dire,* and stated that he had never made a deed to the plaintiff, and for the purpose of determining his competency, that statement, it being

uncontroverted, must be taken as true. The question, therefore, is the same as it would be, if the plaintiff made no pretence of having such a deed. The statements of the witness, on his *voir dire*, are addressed to the Court—who is to determine his interest from the facts stated. He is a competent witness to prove whether he is or not interested. His *voir dire* is for that precise purpose. And if the witness is not impeached by the record—by any thing judicially apparent to the Court—for the purpose of passing upon his competency, his statements must be taken to be true. Otherwise, the whole object of the *voir dire* examination would be defeated. Here the deed is before the Court, apparently in due form executed and recorded—the witness who appears to have executed it, denies that fact. Which shall the Court believe, the witness on his oath, unimpeached, or the deed which that oath denies? About this I apprehend there can be but little doubt. 1 *Green. Evid. sects.* 422--3. *Abrahams vs. Bunn*, 4 *Burrow*, 2256. *Butler vs Carver*, 2 *Starkie, R.* 433. 15 *East*, 37. *Butchers Company vs. Jones*, 1 *Esp.* 160. 7 *Green.* 51. 1 *C. & P.* 73, 8 *C. & P.* 97. 2 *P. & D.* 538. 1 *Gill & J.* 366. 3 *Pick.* 435.

We think, therefore, that the Court erred in admitting Mr. *Pullen* as a witness.

[3.] The deed before referred to, from *Guilford Pullen*, purported to be attested by one *Ray*, and also by *Charles Fields, a Justice of the Peace*, and farther, appeared to have been executed in the county of *Walton*. To prove it a forgery, the defendant offered in evidence, the testimony of persons resident in said county, at the time it appeared to be executed, *to prove* that at that time there was no person acting as Justice of the Peace in that county by the name of *Charles Fields*. It was objected to upon the ground, that by law, Magistrates are duly commissioned by the *Governor*, for the several districts and counties of the State, and that by law, a record of the commissions is required to be kept in the proper office at the seat of Government. And that to prove that there was no such Magistrate in the county of *Walton* at that time, it was necessary to produce a certified copy of the record of commissions, showing that he was not commissioned, as the highest and best evidence. The evidence was admitted, and that is also claimed to be error.

No person is a Justice of the Peace in this State, unless he is

Fain *vs.* Garthright.

duly commissioned by the Governor as such; and a record of commissions, is by law, kept in the proper office at the seat of Government. As these things are required to be done by law, the Court will presume that the officers of the Government do their duty, and, therefore, that Justices of the Peace are commissioned, and that there is a record of such commissions. This record is accessible to parties, and transcripts may be duly certified.

That *Charles Fields* was a Justice of the Peace in the county of *Walton*, when he attested this deed, is proven *prima facie*, by his official attestation as such. In the case of all public officers, it is not necessary, in the first instance, to produce their commissions; proof of their acts in their public capacity is enough. 1 *Phillip's Evid.* 226. *By Buller, J. in Berryman vs. Wise*, 4 *T. R.* 366. *Leach's Crown Cases*, 585, *Lessee of Willink vs. Miles*, 1 *Peters C. C. R.* 429.

It is to rebut this *prima facie* evidence, that this proof is offered; and it is contended, that in as much as the official character of *Mr. Charles Fields, J. P.* can be proved by his acts, that *Mr. Charles Fields's* want of official character can be proved by testimony, that he did *not act* in that character. I do not think that this follows in this case. Is the knowledge of persons resident in that county, at the time of the execution of the deed, to be presumed to be so accurate, and so general, as not to admit of the fact that such a man as *Charles Fields* acted as a Justice of the Peace therein, without their knowing it? I admit that the probabilities are against the fact being so, without well informed, observing men, connected by official or professional position with the people, knowing it. And yet, such a thing is possible. The negative testimony offered does not amount to demonstrative certainty. Whereas, this is one of the few cases, where the record from the Executive office will demonstrate, with absolute certainty, a negative, to wit : if the fact be so, that *Charles Fields* was not a Justice of the Peace for that county, at the time he signed this deed. In legal contemplation, and in fact, he was no Magistrate unless he was in commission for that year—if he was commissioned, it is in legal contemplation true, that his commission was recorded. The record will, therefore, show that he was acting as a Magistrate if the fact be so, and with equal verity that he was not, if the fact be so. The record is the highest evidence,

both in its character, it being record evidence, and in the degree of its demonstrative power; for if it does not show that he *was* a Magistrate, the inference is irresistible, that he *was not* a Magistrate. So we think the Court erred in this particular also.

It is suggested that this man's attestation is good, although he was not a Justice of the Peace for *Walton county,* for in that event, the inference is, that he was a Justice of the Peace for some other county. This idea goes upon the assumption that the official acts of Justices of the Peace are valid out of the county for which they are elected and commissioned. Their election, commission and official oath, confine their official powers to the coun in which they are elected. It has been held that marriages, solemnised out side of the jurisdictional and official limits of a Magistrate, are valid. Perhaps so, and if so, upon grounds wholly irrespective of the official powers of the Magistrate. *See* 2 *Kent's Com.* 87 *to* 93, *and notes.*

[4.] The defendant relied upon the statute of limitations. The Court instructed the jury, that a bond for titles, conditioned to make them when the purchase money was paid, is color of title, and that possession under such a contract is adverse. This decision is also brought up for our revision, and we affirm it.

In the numerous decisions which this Court has been called to makes in cases growing out of our statute of limitations, we have assumed, as the basis of those decisions, that is intended to be, and that we will make it, in Georgia, *a statute of repose.* We look upon it as a highly beneficial statute, and in its effects calculated to quiet titles, suppress litigation, promote confidence in the tenure of property, and advance all the interests of commerce.— Its policy is that of an *anti*-litigating jubilee, (as to lands,) once in seven years. There is no hardship in this policy. Let it be distinctly understood throughout the community, that he who has a claim to land, must assert it within seven years from its accrual or lose it, and it is not to be apprehended that many rights will be lost for want of diligence. And it is not in fact any injustice to require such diligence. He who has a claim to land, with the means of enforcement at his command, and no impediment in his way, yet, who slumbers over it for seven years, permitting his neighbor to improve it by expenditure in the meantime, resting with confidence upon the title which he holds, deserves to lose it. If the statute, in its fair and just import, is enforced, and

it is well understood that it will be, it is obvious that it will give encouragement to labor, and particularly to agricultural enterprize. We are not disposed to improve land, over our title to which hangs an undefined, yet threatening cloud. The prosperity of our young and growing country, depends as much as upon any thing else, upon the encouragement which the general law holds out to industry; and upon the *repose* which it gives to land titles. This reasoning cannot be applied to the defendant and his title; for to him the law opens its Courts of Justice, and invites him and warns him to enter, and the door is kept wide open for a reasonable length of time. He is not in possession, and in danger of losing the fruits of his labor in improving his land. These considerations are sanctioned by high authority. *See Bell vs. Morrison,* 1 *Peters,* 360. *McClung vs. Silliman,* 3 *Peters,* 270. *Bradstreet vs. Huntington,* 5 *Peters,* 407.

Hence we have disregarded some of those subtle distinctions and unreasonable exceptions to the statute, to be found profusely scattered through the English and American books. Exceptions which learned and good men in both countries have not ceased to regret, and which they have sustained, not because commended to their approval for their equity, expediency, or reasonableness, but from a disposition so prevalent (and I will add so praiseworthy) in Courts, to adhere to authority. Our own State having had, until recently, no Court so organized as to give for the State, an authoritative construction of her statutes, we are not hedged in by State decisions and usages, and feel free to give to the statute a construction in accordance with the original intent. These things premised, it is due to candor to say, that the weight of authority is against the decision we now make—that is to say, the weight of authority is against the position, that one entering upon land under an executory contract, *when the consideration money is not paid,* acquires an adverse possession, which time will mature into a good title. A contract for the sale of land by notes for the purchase money and bond, conditioned to make titles when the purchase money is paid, has not been usually held color of title until the purchase money is paid. We think upon principle it is, and that such principles have been settled in the books, as will upon the score of authority justify our opinion. According to the case before me, the contest is not between the defendant and his vendor. He does not plead the statute against

a claim or right set up by his vendor to the land—nor is the contest between the defendant who has come into possession under an executory contract, and the assignee of that contract from the vendor, with, at the same time, a deed from the assignor. But, according to the case made, *Pullen* was the grantee from the State, who conveyed to one by the name of *Woodward,* who conveyed to the plaintiff *Fain. Pullen* also sold to the defendant, by the executory contract before set forth. Against *Fain,* who claims under *Pullen,* the defendant pleads the statute, *Pullen* being still the holder of the notes for the purchase money unpaid. There was no assignment of the interest in this contract, to *Woodward* by *Pullen.*

(This statement assumes that the deed from *Pullen* to *Woodward* was genuine, a fact controverted on the trial.) These things are important to be borne in mind.

It is agreed, that if the title under which the defendant entered, be ever so defective, the possession is notwithstanding adverse.— It does not depend upon the soundness of the title. So if a grantee enter under a deed not executed in conformity to law, believing the title to be good, his possession is adverse. *Sumner vs. Stephens,* 6 *Metc.* 337. 2 *Ibid,* 32. 3 *Ibid,* 91. 16 *Serg. & Raw.* 214. *Jackson vs. Todd,* 2 *Cow. N. Y. R.* 183. *Jackson vs. Sharp,* 9 *John. R.* 162. 12 *Ibid,* 365. 16 *Ibid,* 293. *Ewing vs. Burnet,* 8 *Peters,* 41. *Angel on Limi.* 435. 4 *Georgia Reports,* 115.

*In Panlet vs. Clark,* the Supreme Court held, that possession may be adverse and constitute a bar, even when ouster is in terms repelled, and not to be presumed from the circumstances of the case. 4 *Peters,* 504.

In *Bradstreet vs. Huntington,* the same Court says : " Wherever the proof is that one in possession holds for himself to the exclusion of all others, the possession so held, is adverse to all others, whatever relation in interest and privity he may stand in to others. This doctrine is held in reference to lessors, mortgagors, trustees, and tenants in common. *Willison vs. Watkins,* 3 *Peters,* 53. 5 *Peters,* 439. If the *quo animo,* the *mind* of the tenant, is to hold the property as his own, against the claim of others, which *mind* will be ascertained by proof, these cases make the possession adverse, even though there be privity between himself and others. Whatever may be said of the technical dis-

tinctions which fix and determine the character of an executory contract like this, in point of fact the tenant entered upon the property with intent to hold it. We shall see farther as to the character of this contract anon.

So one entering under a void devise, is protected by the statute against the heirs. 16 *Peters*, 455. 6 *Munf.* 355. 1 *Wheat.* 479.

So also, one entering and claiming title to land, under a parol gift only, holds adverse possession. *Sumner vs. Stephens*, 6 *Met.* 337. 5 *Ibid*, 469.

It is to show generally, by these authorities, that the statute will protect against the legal title, still retained and outstanding in the vendor, that I refer to them; and that in this case it does not follow, because, by the contract the legal title is retained by defendant's vendor, that the possession is not adverse.

What are the respective rights and obligations of the parties to this contract? In Equity the vendor, as to the land, is the trustee of the vendee, and the vendee is the trustee of the vendor, as to the purchase money. *Atk. R.* 572. 1 *Ch. Cas.* 39. 6 *John. Ch.* *R.* 398. Either party may go into Equity and have the contract executed, and the same equities subsist between the parties, either of them, and assignees or purchasers with notice. 10 *Moll.* 518. 2 *Eq. Cas. Ab.* 32. *Pl.* 43. 2 *Vesey, Jr.* 437. 16 *Vesey*, 249. 17 *Vesey*, 433, *S. C.* 6 *John. Ch. R.* 398.

Upon payment of the money, the purchaser may compel the vendor to convey. So also, his assignee. So the vendor has a lien upon the land for the purchase money, which he can assert in Equity against the vendee and purchasers from him. The vendor, no doubt, too, may maintain ejectment, within the statutory term, against the vendee, and it has been held that the vendee has such interest in the land, as may be seized and sold under execution. 18 *John. R.* 97. 3 *Caine's R.* 188. 7 *John. R.* 206. Upon this point the authorities are in conflict. 17 *John. R.* 331.

Although by this contract the title never passed to the purchaser, yet in Equity, by virtue of the agreement, the estate was in the vendee, and was in him transmissible by descent and devisable by will. *Ch. Kent in Champion vs. Brown*, 6 *John. Ch. R.* 398.

Now if the purchaser has an equitable estate in the land, he has the power to enforce his contract in Equity against the vendor and

his assignees and purchasers from him.   The power to assign the
interest in the contract, it would seem to be but reasonable,   that
the possession of the land, under rights in Equity, should be as good
against the vendor, as possession under any other color of title.
The reasoning against it is rather technical; it is mainly this, that
he holds in subserviency to the legal title in the vendor.   The re-
ply is, that the title, by the contract, is retained as a   security for
the money, which security he can enforce at Law, and he is as
much bound to enforce it within the time prescribed by the stat-
ute, as any demandant would be bound to assert his claim against
an adverse possession.   If he fails to do so, the statute estops him.
The title is reserved for no other purpose but as security.   The
vendee is let into possession as owner, subject only to the vendor's
reclamation upon the land, for purchase money unpaid.   The
question whether, *in Equity*, the vendor may not enforce his lien
upon the land, after the bar of the statute, is a different question,
which I will not discuss.   The question here is, can the vendor
recover upon his naked legal title, after the statute has run the
whole term ?   Ought he, upon the principle upon which the stat-
ute goes, of *diligence* for a term of years as to one party, and *re-
pose* afterwards as to the other ?

The question, however, made by this record, is not whether the
contract would create a color of title, and an adverse possession
against the vendor in behalf of his vendee; nor is it between that
vendee and the assignee of the vendor's interest in the contract,
who may be, at the same time, the purchaser of the legal title.   But
it is between the vendee and a stranger to the contract, who has
none of the equities against him, which his vendor has, who holds
no notes for the purchase money, and therefore, no lien upon the
land and no right of reclamation upon it.   His relation to the de-
fendant is very different from what the vendor's would be, were
he sueing for the land.   This distinction seems to have had great
weight with the Court in the great cases in Pennsylvania, grow-
ing out of the sale by executory contract, of the proprietary lands
of that State.   It was held that the limitation act of that State
did not apply to actions of ejectment brought to enforce the pay-
ment of the purchase money.   The Court seemed to consider
that it was *agreed* between the parties, that the land should be a
security for any length of time for the purchase money.   The in-
ference is that the statute was no bar for that purpose only, and

Fain *vs.* Garthright.

that it would be to a stranger to that contract, although he might claim title from the defendant's vendor. *Kirk vs. Smith,* 9 *Wheat.* 244. *Angel on Limi.* 438.

The language of our Statute is broad enough to comprehend this and every other suit, or action, or writ. It seems to have no reference to 'the relations of the parties, except in the exceptions named. It says not one word about adverse possession or color of title. It lays a plain burden upon the plaintiff, and prescribes to him a plain duty. It intends, in *all cases* of right or claim of title, to require the claimant to assert his remedy within the time prescribed, at the peril of having that remedy barred. Its language is to the effect, that, no suit or action of any kind, shall be brought for land, no matter upon what right or claim originating, after seven years from the accrual of such right or claim. It is particular in its specification of some remedies, and then in all comprehending terms, excludes every possible remedy by suit, unless brought within the limited time. And as if intensely anxious that there should be no misapprehension of its meaning, it designates the causes of action upon which suit or action may arise, in such terms as must include all. For it bars all writs, suits or actions whatsoever, which may be sued or brought, " by occasion or means of *any title or cause*" of action. It intends, not only to bar suits for the quieting of *titles* to lands; but suits brought upon *any cause* of action. This last specification embraces this case : It may be said that this is not a suit, really to try titles—or would not be if defendant's vendor were sueing—but a suit to enforce a security. Be it so. The action is founded on some *cause*, and by the Statute, such an action is barred. Again, the act, not content with declaring that suits shall be brought within seven years, in addition, declares that they shall be brought "*at no time after seven years*." It is in the following words : " Be it enacted, that all writs of formedon in descender, formedon in remainder and formedon in reverter of any lands, tenements or hereditaments, or *any other writ, suit or action, whatsoever*, at any time hereafter to be sued or brought by *occasion or means of any title, or cause* heretofore accrued, happened or fallen, or which may hereafter descend, happen or fall, shall be sued and taken within seven years next after the passing of this Act, or after the title and cause of action shall or may descend, or accrue to the same, and *at no time after the said seven years*." The Act then proceeds to

limit the right of entry and to specify exceptions.   *Prince,* 573, 4.

Any plain, sensible man, it seems to me, looking at this Statute for the first time, and applying its provisions to the case before me, would say at once, that the plaintiff having a title to the land in question, was bound to bring his action for it within seven years from its accrual—that the question could not arise under the Statute, whether the defendant's possession was adverse or not—but that the only question that could arise, is, has the plaintiff used the diligence on his part which is required of him ? Learned men, long ago, have laid the fact of diligence at the foundation of the acts of limitation.   Thus *Lord Coke* says, commenting upon the acts of limitation prior to the Statute 32 *Henry* VIII. : " Many suits, troubles and inconveniences did arise, and therefore, a more direct and commodious course was taken, which was to endure forever, and *calculated so to impose diligence on, and vigilance in him that was to bring his action,* as that by one constant law, certain limitations might save both for the time present and for all times to come." 2 *Inst.* 95. *Stovy's Conf. of Laws,* 482.   It is true, however, that the Courts have contrived to put the question of diligence very much out of view, as the criterion of judgment on acts of limitation, and for it, have substituted a question as to the *quo modo* and the *quo animo,* in which the defendant acquired his possession.   Much of the learning found in the books in relation to limitations, is highly beneficial, and many of the rules which have grown up by judicial action, under the Statutes in England and in this country, are salutary and necessary.   Yet it becomes even our humility to say, that many of the exceptions to the operation of the Statute, which the Courts in Great Britain have engrafted upon it, and the subtle distinctions by which they have been sustained, are alien to the original policy of the Statute, violative of its spirit, and eminently unsuited to the condition of our country.   Over and over again have the Judges in England and in this country, regretted these departures from the primary intent and plain meaning of the Statute.   And shall we follow them, through regard only to authority?   Authority which has not upon us the obligation of law !   We have not adopted either the English or American construction of the Statute of James.   Our limitation Act was passed in 1767—it was a Provincial Statute—it was repealed and revised in 1806.   Our adopting Act of 25*th Feb.* 1784, declares

Fain *vs.* Garthright.

that all acts and parts of acts, in force and binding upon the inhabitants of the *Province* on the 14*th May*, 1776, shall be in force in this State. It also adopted the *Common Law*, and such of the *Statutes of Great Britain* as were usually of force in the *Province* of *Georgia*. The Act of 1767 was one of the *Provincial* Statutes adopted in 1784. It was not of force in the Colony as a *British* Statute, but *propriore vigore* derived from the *Provincial Legislatare*. We did not, therefore, adopt the constructions of its *British* prototype. Whatever constructions were made in the Province, of the *Act* 1767, may be considered as binding upon this Court—what they were, our records do not show. And (as I before stated) inasmuch as prior to the organization of this Court, there was no Court in this State so organized as to give a uniform and authoritative construction of our Statutes ; we feel at liberty—nay more—*invoked* to establish a construction of our act of limitations, according to our best judgment of its primary meaning and object. We will return to its plain meaning, not at the same time disregarding many, very many consistent and salutary rules that have grown up under it ; believing with the learned *Judge Dorsey* of *Maryland*, where, remarking upon the limitation Act of his own State, " that this is not the epoch when that salutary protection which the Legislature has wisely thrown around us, as a safeguard against fraud and oppression, should be frittered away by Judicial refinements and subtle exceptions, that never entered into the contemplation of its enlightened framers." *Green, Executor, vs. Johnson et ux.* 3 *Gill & Johns. R.* 394.

The question whether an executory contract is color of title, and made the possession adverse, was ably discussed before the Court of Errors of the State of New York, and the principles there settled, go very far to sustain the decision we now make. One of the questions discussed in that case, was whether a possession under a paper writing, was adverse ? The paper writing purported to be a permission from *McKay* to the elder *La Frombois,* to take two lots of land in his seigniory on *Lake Champlain,* and to settle himself thereon, and a promise, that when the conveyances of the lots should be made, (for one of which he should pay no rent, only one of acknowledgment, in case the lot of land he should take should be required to establish the domain,) he would replace to him as much improved land, as might be found on the

two lots. The possession began under this contract. It was executory—no deed was proven to have passed. *Chancellor Jones* said: " The writing produced, admitting it to be simply a contract for conveyance, is in accordance with the possession held, and the claim of title under it. His entire confidence in his title, and his reliance upon its sufficiency to protect his possession, and the assertion of his rights under it, against the claim of the proprietors under the patent, are decisive of his own opinion and belief of the validity of his title. It was an express agreement, by a person claiming to have the right to contract for the disposal of the land, to convey to him the lot he should locate, when conveyances were to be given ; and an agreement that he should enter into immediate possession, and hold the premises thus contracted to be conveyed to him, without rent, until the conveyance should be given. Under such an agreement, reduced to writing, and followed by possession and improvements, the defendant acquired a title in equity to the land ; if *McKay*, the party contracting to convey, had at the time, or afterwards, acquired the right or power to perform his agreement. It was a contract which equity would have enforced the performance of, and the right of *La Frombois* under it was the more perfect and stable, as the consideration had been already paid or satisfied by him to *McKay*, and there was nothing farther to be done by him to entitle him to a conveyance of the legal title. Hence, it probably was, that he insisted so firmly and peremptorily upon his absolute right to the land, and put his claim to it upon the ground of title ; doubtless, resting upon some subsequent conveyance in execution of the agreement, or considering his contract tantamount to a deed. It does not expressly appear that he ever obtained an actual conveyance for the lot ; but he had an agreement which entitled him to a deed. He may have been in possession of some farther muniments, which, in the conflagration of his house by the enemy, or from some other cause, were lost or destroyed. But, suppose the contract to have been his only title, it was an absolute engagement of a person assuming to be owner, to give him a deed of conveyance." After some farther remarks, *Chancellor Jones* added, " Then had not *La Frombois*, from the time of his entry until his death, the greatest reason to believe that the title which he held, under *McKay*, whether that title was *legal* or *equitable* was valid in law, and gave

Fain *vs.* Garthright.

full protection to his possession, and improvements? And if he had reason to believe, and did believe that his title was good, as he must be presumed to have entered under that title, his possession having continued for twenty-six years after his return to his home, after the close of the revolutionary war, must bar a legal recovery by the plaintiff, admitting them to have the legal title, in this form of action." *La Frombois vs. Jackson,* 8 *Cowen R.* 597, 598.

In *Moore vs. Webb,* 2 *B. Munroe's R.* 283, it is held, that though one enter under an executory contract of purchase, and such entry in its legal character is a tenancy at will, yet, such an one may hold adversely in fact. The cases are numerous that settle, that when one enters under an executory contract, and the consideration is paid, the possession is adverse, although no deed has been given. See *Angel on Limitations,* 437. 5 *Metcalf R.* 173. 12 *John.* 491.

The case of *Hunter vs. Persons* was, in principle, the same with this, and I consider, fully sustains the view we take of it. There A contracted to purchase lands of B, and paid *part* of the purchase money, but titles never were made. A gave the land to his son C, who went into possession; and it was held that C's possession was adverse, both to A & B. In the case before us, none of the consideration was paid; in *that,* a part remained unpaid. If any was unpaid, the cases are analagous. 2 *Baily, S. C. R.* 59.

Upon a fair construction of our own Statute, as applicable to this case, and upon the principles and authorities stated and referred to, we are constrained to sustain the decision of the Court below, upon the plea of the Statute of Limitations.