MOSES MERRICK and another, Respondents, v. ALFRED VAN SANTVOORD, Executor of ABRAHAM VAN SANTVOORD and LEONARD W. BRAINARD, Appellant.

The members of a foreign corporation are not personally liable, in another jurisdiction, either for its debts or its torts, unless such liability is imposed by the terms of its charter, or in virtue of some positive law.

The rules of State and national comity are subject to local modification by the law making power; but rights and immunities granted by another government, so far as they are consistent with our domestic policy, and unabridged by our own legislation, are entitled to recognition and protection in our State tribunals.

As there are certain conservative powers not derived from grant, but inherent in every government because essential to its existence, so there are certain obligations, springing from the necessities of national intercourse, and recognized by all civilized communities in the law of general comity.

The recognition of the rights, hitherto conceded in our courts to foreign corporations, is neither repugnant to our policy nor opposed to the spirit of our legislation; and no reason exists for withholding from them the benefits of the law of comity, which, in other sovereignties, are accorded to our own corporations.

The domicile of a corporation is in the legal jurisdiction of its origin, and it is in its nature incapable of migration; but its charter may confer powers without territorial limitation, and these may be exercised elsewhere, if they are in conflict with no restrictions of local law.

When there are no restraints in the corporate charter, in respect to the residence of its officers, or the place where its business should be conducted, no such restrictions can be imposed by the tribunals of another State, without the sanction of the law making power.

A corporate franchise granted by one State cannot be revoked or annulled by the courts of another; and especially not in a proceeding to which the corporation is not a party.

APPEAL from the affirmance, in the fifth judicial district, of a judgment rendered at the Oswego circuit against both the defendants for $6,846.56.

The action was for damages caused by the negligence of the proprietors of steamer Cayuga in towing the boat Camden, by which the latter was sunk in the Hudson river, and the bulk of the cargo lost.

The defendant Brainard was one of the proprietors of the Cayuga, and the Steam Navigation Company was another.

The latter was a Connecticut corporation, and it was held that, as the business of the corporation was wholly conducted in the State of New York, except the maintenance of its organization by annual elections in the State of Connecticut, it must be deemed to have migrated to New York, and to have thereby forfeited its charter; and the testator, Abraham Van Santvoord, who was a member, officer and agent of the company, was personally liable for the debts and torts of the corporation.

A full statement of the principal facts will be found in 38 Barbour, 574, where the case is reported in the Supreme Court. The judgment was affirmed in that court as to both defendants; Mr. Justice MORGAN dissenting from its affirmance as to the defendant Van Santvoord.

*Cornelius Van Santvoord* and *Francis Kernan*, for the appellants.

*William F. Allen*, for the respondents.

PORTER, J.    The defendant Van Santvoord was not a party to the contract with the proprietors of the Camden, and he did not navigate the steamboat by which that vessel was towed. He neither owned nor chartered the Cayuga, nor did he take any part, as agent or otherwise, in chartering it. He was held liable on the sole ground that he was a stockholder in the Steam Navigation Company, and that Mr. Redfield, who was the secretary of that company, and who acted in its behalf, united with other parties in chartering the steamer Cayuga, for the use of the Hudson River Towing Association. To connect the defendant with the liability, the court below found it necessary to hold, in substance: 1. That there *was* such a corporation as the Steam Navigation Company; to the end that he might be bound, as a shareholder, by the corporate acts of its officers. 2. That there was *no* such corporation; to the end that he might be held responsible as a partner, for debts contracted, and for torts committed by other persons assuming to act in its name.

Mr. Van Santvoord was a citizen of this State, and he became a stockholder in the company on the faith of the pledge in its charter, from the State of Connecticut, that its members should be subject to no individual liability. The corporation has exercised its franchises for more than thirty years, and in that State the pledge has been hitherto observed. No law of New York has imposed such liability on the members of foreign corporations, as a condition to the exercise here of rights derived from other governments, and recognized by the rules of general comity. The charter of the company is not impeached for fraud in its origin. It was granted to citizens of Connecticut; the shares were made transferable; and there were no restrictions of residence, in respect either to the members of the company, or the officers they might select for its management, except that they should be stockholders and citizens of the United States. That charter has neither been revoked by the authority which granted it, nor annulled by judicial decree. The company has continued its organization by annual elections in the State of Connecticut. It was under no restriction as to the place where its office should be kept, or as to the waters on which its business should be conducted. It has exercised no powers but those conferred by its charter, and it is charged with no violation of our local statutes. It is held, however, by the court below, that Mr. Van Santvoord was personally liable for the debts of the company, and for the acts of its officers; inasmuch, as it appears, in a suit in which the corporation is not a party, that only a portion of its officers reside in Connecticut; that it holds in that State none but its annual meetings for the election of directors; that the business in which it is practically engaged, is the navigation of the Hudson river, and that its principal office is in the city of New York. The judgment is, in effect, that the company migrated, and thereby forfeited its franchises; that this forfeiture could be collaterally declared, in a suit *inter alios* before the courts of another State; and that any shareholder can be held personally liable on all contracts made in the name of the company by its officers.

The liability of the Steam Navigation Company to the plaintiffs, in its corporate character, is a necessary result of the facts found at the Special Term; whether it was or was not guilty of the misuser of its franchises imputed to in the court below. We have had occasion to decide, in a recent and leading case, that where an Indiana and Michigan railroad company, each having authority to construct and maintain a road within the limits of its own State, united in the business of transporting passengers on a railroad in Illinois, beyond the limits authorized in the charter of either, both companies are jointly liable for an injury to an Illinois passenger, through the negligence of their common employés. (*Bissell* v. *The Michigan Southern & Northern Indiana R. R. Companies*, 22 N. Y., 258.) If the decision of the Supreme Court, in the present case, can be sustained as to the defendant Van Santvoord, it must be upon the anomalous ground that, in the absence of any contract or statute imposing personal liability, the same precise state of facts, which will uphold a judgment against a foreign corporation, will support one against either of its shareholders.

The only contract ever made by Van Santvoord, which has any bearing on the present issue, was that which he made on becoming a party to the Connecticut charter. That certainly did not make him a partner, either of the defendant Brainard, or of Mr. Redfield, the secretary of the company. He gave no power to either to contract for him, and no consent to be responsible for their tortious acts. His contract with the State of Connecticut was for immunity from personal liability. The plaintiffs insist, that the burden is upon him to show how he was ever relieved from the liability of a partner. This is a precise inversion of the rule. The *onus* is upon the plaintiffs to show that he ever assumed any such liability; or that he became chargeable with it in law, through his own acts or through those of the company. No statute of that State, or of this, has been violated either by him or by the corporation. The fact is found, that his contract was that of a corporator, with immunity from personal responsibility. Even if the charter had been silent, he would

not have been liable for the debts of the company, either
there or here, unless by force of some statute depriving him
of his exemption. (*Ex parte Riper*, 20 Wend., 616; *Seymour
v. Sturgess*, 26 N. Y., 134.) The boats of the company were
not his boats. Its debts were not his debts. In the case of
*The Bank of Augusta* v. *Earl*, the Chief Justice said:
" Whenever a corporation makes a contract, it is the contract
of the legal entity of the artificial being created by the
charter, and not the contract of the individual members."
(13 Peters, 587.) In Connecticut the defendant was clearly
entitled to protection. How does it happen that on one side
of the State line he owns the property, which on the other
belongs to the company, or that by crossing the New York
boundary he assumes all the liabilities of the corporation?
It is conceded that he was not a partner when the company
kept an office in Connecticut. He has done nothing since,
and nothing has been done by the corporation, which changes
in law their mutual relations. It has been hitherto supposed
that the members, even of a domestic corporation, could not
be charged with personal liability without their consent,
except by the law making power; but in the present case it
is claimed that, upon considerations of public policy, such
liability can be imposed by the courts on the members of a
Connecticut corporation, against the stipulations of its char-
ter, and without statutory authority either there or here.

No warrant for such a proposition can be found in our
general statutes. We exercise the right, which exists in all
sovereignties, to regulate and restrain foreign corporations in
doing business here under charters from other governments.
We prohibit them from the exercise of certain banking pow-
ers. (1 R. S., 712.) We require from insurance companies
appropriate guaranties for the security of our own citizens.
(Laws of 1851, ch. 95; Laws of 1857, ch. 30, 548.) We
require all foreign corporations doing business in this State
to keep their transfer books and lists of shareholders here,
subject at all reasonable times to inspection by parties in
interest. (Laws of 1842, ch. 197.) We require every such
corporation to facilitate proceedings against it in our own

courts, by filing, in the office of the secretary of State, a written designation of some resident in each county where its business is conducted, on whom process may be served; and, in the absence of such designation, we authorize service of process on the company, by delivery to any of its resident agents. (Laws of 1855, p. 270.)  We subject to attachment and sale on execution, at the instance of creditors in this State, the choses in action held by such companies against our own citizens and domestic corporations. (Laws of 1842, ch. 197.)  These various regulations and restrictions imply the validity of the exercise here, of powers granted by other governments; but we have other statutes expressly recognizing the rights of foreign corporations as contracting parties and litigants, except so far as they are limited by the tenor of their own charters, or abridged by the force of our local laws. (2 R. S., 457, §§ 1, 2; Code, § 437.)  These acts of the law-making power operate as a recognition, not only of the legal existence of such corporations under charters from other States, but of the rights and immunities conferred on the corporators.  Except so far as these are cut down by our own legislation, they are perfect and absolute, until they are revoked or annulled in the State from which they were derived.

The considerations of State policy, which controlled the decision in the court below, seem to us less weighty than they would appear, at first view, on reading the opinions of the learned judges.  We think the recognition, in our State, of the rights hitherto conceded in our courts to foreign corporations, is neither injurious to our interests, repugnant to our policy, nor opposed to the spirit of our legislation.  Ours is peculiarly a commercial country.  We have large inland lakes, which serve as State and national boundaries.  We have continental rivers which unite the States they seem to divide; and, at their head waters, the tributaries of two oceans interlock.  We have every variety of climate and production.  Our agricultural and mineral resources are almost boundless.  We have great facilities for internal intercourse, and favorable openings on every side in the

various departments of human industry and enterprise. By common consent, all these advantages have been regarded as open to every American citizen; though many of the inland States are untouched by the great natural highways of commerce.

In no other country has so much been achieved, by the association of capital and labor, through corporate organization. It has enabled the many, whose means were limited, to contribute to the accomplishment, and participate in the benefit of great undertakings, which were beyond the compass of individual resources and enterprise. It has taken, without let or hindrance, the direction to which it was invited by the general law of supply and demand. The same enlightened policy has prevailed in every portion of the country. All have welcomed labor from abroad, and invited the free investment of capital. Hitherto, corporate enterprise has not been trammeled by unfriendly legislation. No jealousy of competition, or rivalry of adverse interest, has been permitted to convert State lines into barriers of obstruction to the free course of general commerce. Its avenues have been open to all.

In this country our material interests are so interwoven that the union of the States is due, in its continuance, if not in its origin, as much to commercial as to political necessity. The citizens of each claim a birthright in the advantages and resources of all. They demand, from their local authorities, such facilities as the law making power can afford, in the employment of labor and capital. They claim such corporate franchises and immunities as may enable them to compete on equal terms with the citizens of other States. For these, from the structure of our institutions, they naturally look to their own government. They acknowledge a double allegiance in their local and federal relations, which, by general consent, carries with it a correlative community of rights. They may live in an inland State, but they are none the less citizens of a maritime nation; and they may lawfully organize companies at home for traffic on ocean highways.

A corporate charter is in the nature of a commission from the State to its citizens, and their successors in interest, whether at home or abroad. Each government, in the exercise of its own discretion, determines the conditions of its grant. It is free to impose or omit territorial restrictions. It cannot enlarge its own jurisdiction, but it can confer general powers, to be exercised within its bounds, or beyond them, wherever the comity of nations is respected. For the purposes of commerce, such a commission is regarded, like a government flag, as a symbol of allegiance and authority; and it is entitled to recognition abroad until it forfeits recognition at home.

Under such commissions, New York has sent forth its citizens from time to time with corporate franchises and immunities, to gather wealth from the coal mines of Pennsylvania, the silver mines of Mexico, and the gold mines of California; to establish lines of inland navigation on the Orinoco and the Amazon; to plant forest trees beyond the Mississippi; to fish in the northern and southern oceans; to found christian missions in Asia, and to colonize freedmen on the coast of Africa. In many of these cases the franchises were, by the terms of the charter, to be exercised in foreign territory. In 1826, for instance, Churchill C. Cambreling and others were, by a law of New York, constituted a body corporate, under the title of "The United States Mexican Company," organized "for the purpose of purchasing, leasing and working gold and silver mines in Mexico and South America." (Laws of 1826, 143.) In the act of 1827, incorporating "The New York South American Steamboat Association," it was provided that the annual elections should be held in the city of New York, but there was no requirement that any of the officers should be residents; and the company was authorized, in terms, to navigate its vessels "upon any water or waters *not within the jurisdiction of New York.*" (Laws of 1827, 308.) The Panama Railroad Company was organized, under a charter from this State, to construct and maintain a railway "across the isthmus of Panama, in the republic of New Grenada." The only act

which the charter requires to be done in this State, is the annual election of its officers; and, on the theory maintained by the respondents, every shareholder in that company, wherever found, is individually liable for all the wrongs it commits, and all the debts it contracts. (Laws of 1849, 407.) Other illustrations of our legislative construction of the rules of national comity, will be found in the acts incorporating the "North Carolina Gold Mining Company," the "Orinoco Steam Navigation Company," the "Pacific Mail Steamship Company," the "California Inland Steam Navigation Company," the "African Civilization Society," and the "American Forest Tree Propagation and Land Company." (Laws of 1828, 211; id., 1847, 513; id., 1848, 396; id., 1850, 627; id., 1864, 758; id., 1865, 360.)

The mutable nature of the tenure, in this State, of property invested in foreign corporations, would be strikingly illustrated if the present judgment should be upheld, by the judicial experience of the Steam Navigation Company, which has hitherto been held by our courts to its just responsibilities, and protected in the exercise of its corporate rights. (*Miller* v. *Steam Navigation Company*, 6 Seld., 431; *Wells* v. *Same*, 4 id., 375; 2 Comst., 204; *Steam Navigation Company* v. *Weed*, 17 Barb., 378.)

We think the policy of this State is in harmony with that of the country, and that it would be neither provident nor just to inaugurate a rule which would unsettle the security of corporate property and rights, and exclude others from the enjoyment here of privileges which have always been accorded to us abroad. Our national commerce is but the aggregate of that of the States, and every needless restriction, by the operation of local laws, is unjust and calamitous to all. We suppose the rules of comity, on which we have heretofore acted, to be generally accepted and approved. We see no reason why a southern State may not grant, to a corporation of its planters, the right to erect mills for the manufacture of their cotton in New England; nor why the legislature of Massachusetts may not authorize a company of Lowell millers to raise cotton in South America, or on the Sea Islands.

The State of Illinois touches neither the Atlantic nor the Pacific; but if it should organize a company of its citizens to transport produce on the ocean, with its office in the city of New York, and its business conducted by managers, elected annually in Chicago, the rights of the corporation would be recognized wherever the obligations of national law are respected.

The rules of comity are subject to local modification by the law making power; but, until so modified, they have the controlling force of legal obligation. The franchises and immunities which they secure, it is the duty of the courts to respect, until the sovereign sees fit to deny them. The rights of a foreign suitor or defendant, so far as they are unabridged by legislation, are as imperative and absolute as those of the citizen. These rules have their place in every system of jurisprudence. As there are certain conservative powers not derived from grant, but inherent in every government because essential to its existence, so there are certain obligations, springing from the necessities of national intercourse, and recognized by all civilized communities in the law of general comity. They have been uniformly acknowledged and enforced by the courts of this State. (*Bard* v. *Poole*, 2 Kern., 495; *Mutual Benefit Life Insurance Co.* v. *Davis*, id., 569; *Mumford* v. *American Life Insurance & Trust Co.* v. *Townsend*, 24 Barb., 658; *New York Floating Derrick Co.* v. *New Jersey Oil Co.*, 3 Duer, 648; *Morris Canal and Banking Company* v. *Townsend*, 24 Barb., 658; *American Life Insurance Co.* v. *Townsend*, 11 Paige, 635; *Steam Navigation Co.* v. *Weed*, 17 Barb., 378; *New Haven Railroad Co.* v. *Schuyler*, 17 N. Y., 592; 33 id.) Their authority is fortified by repeated adjudications in our federal tribunals. (*The King of Spain* v. *Oliver*, 1 Pet. C. C., 276; *Society for Propagating the Gospel in Foreign Parts* v. *Town of Pawlet*, 4 Pet., 480; *Bank of Augusta* v. *Earle*, 13 id., 519; *Runyan* v. *Costar*, 14 id., 122; *Tombigbee Railroad Co.* v. *Kneeland*, 4 How., 16.)

The rights of foreign corporations have been protected in the English courts on the same general principle of public

law. (*The Nabob of Carnatic* v. *The East India Co.*, 1 Vesey, 371; *The Dutch West India Co.* v. *Henriquez*, 1 Strange, 612; *The King of Spain* v. *Mullett*, 2 Bligh's N. S., 3.) We had the benefit of the rule in the suit instituted in Great Britain, in the case of the *United States against Smithson's Executors*. Indeed, the law of international comity in the interest of commerce, which has so long prevailed in that country, is recognized in a provision of *Magna Charta;* which elicited from Montesquieu the encomium, that the English have made the protection of foreign merchants one of the articles of their own liberty.

The theory on which the Supreme Court held the defendant Van Santvoord liable, was, that he was a member of an absconding corporation; that it had migrated from Connecticut to New York; and that, by such migration, it had lost its corporate character, except for the single purpose of charging its shareholders with personal liability, on the contracts made here by its officers. In these views we cannot concur.

A corporation is an artificial being, and has no dwelling either in its office, its warehouses, its depots or its ships. Its domicile is the legal jurisdiction of its origin, irrespective of the residence of its officers or the place where its business is transacted. It retains that domicile until it ceases to exist; and its existence continues, within the limits assigned for its duration, so long as it complies with the requirements of its charter, and with the conditions imposed by State laws, maintains its corporate succession by elections in the proper jurisdiction, and continues to exercise its franchises under a grant which has neither been impeached nor revoked.

To support the theory of migration and forfeiture, the respondents rely mainly upon a passing dictum of Chief Justice TANEY, in the case of the *Bank of Augusta* v. *Earle*, transcribed by Judge THOMPSON *in haec verba*, in the subsequent case of *Runyan* v. *Foster*. (13 Pet., 588; 14 id., 129.) We think the effect of this dictum has been misapprehended, and that the true import of the observation of the Chief Justice is, not that a corporation is *capable* of migration, and

of thereby forfeiting its rights, but that in its nature, as an artificial creation of law, it is utterly *incapable* of migration, and must be deemed to retain its domicile in the jurisdiction from which its being is derived. "It is very true," he said, "that a corporation can have no legal existence out of the boundaries of the sovereignty by which it was created. *It exists only in contemplation of law,* and by *force* of law, and when that law ceases to operate, and is no longer obligatory, the corporation can have no existence; it must dwell in the place of its creation, and cannot emigrate to another sovereignty."

It was a suggestion in answer to the argument, that, inasmuch as the corporation could not migrate, it could neither contract nor sue, except in the State of its domicile. He admitted its incapacity to migrate, but held that it did not follow that its existence there would not be recognized elsewhere. It was accordingly adjudged, in that case, that contracts made in the city of Mobile, between citizens of Alabama and a Georgia bank, a Pennsylvania bank and a Louisiana railroad company, respectively, could be enforced under the general law of comity as contracts within the scope of their respective charters, though unauthorized by the State of Alabama. The Chief Justice expressed the opinion that no valid reason can be assigned for refusing to give effect to the contracts of foreign corporations, "when they are not contrary to the known policy of the State, or injurious to its interests. It is nothing more than the admission of the existence of an artificial person, created by the laws of another State, and clothed with the power of making certain contracts. It is but the usual comity of recognizing *the law* of another State." (13 Pet., 519, 598–590.) The concession referred to was reiterated in the same sense by Judge THOMPSON, and in answer to a similar argument in the case of *Runyan* v. *Costar*, in which it was adjudged that a coal company organized in New York, for the purpose of mining coal in Pennsylvania, could exercise its franchise by purchasing and holding lands in the latter State; and though, by a statute of Pennsylvania, lands so acquired were subject to

forfeiture, the title of the company was good so long as the forfeiture was not enforced by the State. (14 Pet., 122, 129.)

The plaintiffs also rely on an incidental observation of Judge DENIO, in the case of *Bard* v. *Poole*, "that it would be a violation of our sovereignty for a foreign corporation to remove from the country or State where it was created to locate wholly in this State." (2 Kern., 507.) The language was perhaps less guarded and precise than that of Chief Justice TANEY, as it was a mere passing disclaimer in stating the general grounds of the judgment; but it doubtless had reference to the incapacity of a mere creature of local law to migrate to another jurisdiction, and, by its own mere act, to acquire there the rights of a domestic corporation. But the dictum of the learned judge, if accepted in a broader sense, would have no application to the present case; where the corporation, from year to year, continued the succession of those charged with its management, by elections held in Connecticut, this being the only particular in which it was required, even by implication from the terms of the charter, to exercise any of its franchises within the limits of that State.

It is true, as the chancellor of New Jersey held, in the case of *Hill* v. *Beach*, that when parties in one State engage in a joint enterprise and adopt a partnership name, they cannot evade personal liability by incorporating themselves in a similar name, under the general statute of another State; but the ground of the decision was, not that the corporation migrated to New Jersey, but that it never existed in New York, where its inception was utterly void, as a flagrant fraud upon the law.

In this case we think the Supreme Court erred in assuming, that the exercise by the corporation in another State, through officers and agents residing there, of the powers with which it was endowed at home, was an act of corporate migration, even if it was capable of such migration. "It is true," as the court said in the case of *Wright* v. *Bundy*, "that corporations cannot migrate from one sovereignty into another, so

as to become legal local existences within the latter sovereignty; but it is also true that the migration of the *directors* of a corporation from one sovereignty into another, does not terminate the existence of such corporation within the sovereignty which created it." (11 Ind., 404.) Its domicile was not controlled by the place where its office was kept, where its books and papers were deposited, or where its business was done. Its powers had no territorial limitation; and it fully complied with the only local requirements in its charter, which were limited to its original organization, and the annual election of its managers. The grant of franchises without restriction is equivalent to a specific authority, to exercise them wherever the company might find it convenient or profitable, whether within or without the limits of the State of Connecticut. (*Bank of Augusta* v. *Earle*, 13 Pet., 588; per TANEY, Ch. J.)

The decisions of the other States, the course of New York legislation, and the general usages of the country, are all opposed to the theory on which this case was decided. From the centralizing tendencies of commerce, the transferable character of corporate stock, and the necessities of domestic and foreign intercourse, the principal offices of many of our most important corporations in the inland States are kept in our seaboard city. It would be equally disastrous to the citizens of our own and of other States, if judicial innovations were permitted in applying the rules of general comity. Kindred questions have arisen in New England, and there, as here, the decisions of the courts have been uniform. The fact, that the books and records of a Florida corporation were kept in the State of Massachusetts, and that its president and other officers resided there, was held not to divest it of its character as a foreign corporation, nor to deprive its trustees of immunity from prosecution for its debts. (*Danforth* v. *Penny and Trustees*, 3 Metc., 564.) In a subsequent case, a Rhode Island company, having purchased lands in Massachusetts, by authority of the legislature, claimed to be, in respect to such property, a domestic corporation, and entitled to the benefit of the provisions regulating the taxation of those

institutions; but the claim was not sustained. The court held that its character must be determined by the source of its corporate authority. Chief Justice SHAW said: "Its existence, its franchises, powers, capacities, duties and liabilities, are created, fixed, limited and qualified, both in action and time, by the law of the State granting the charter." (13 Gray, 489.)

It is equally clear that a corporate franchise granted by one State, cannot be revoked or annulled by the courts of another, and especially in a proceeding in which the corporation is not a party. In the case of the *Silver Lake Bank* v. *North*, it was held, by Chancellor KENT, that the courts of this State would not determine, in a collateral way, a question of misuser by a foreign corporation; and that it was for the State of Pennsylvania, which granted the plaintiff's charter, to revoke or annul it in case of forfeiture. (4 Johns. Ch., 373.) So, in the present case, until the State of Connecticut recalls its grant to the Steam Navigation Company, or until the corporation is dissolved by judicial decree, its continued organization is presumptive evidence of continuing authority. (*Barclay* v. *Tallman*, 4 Edwards, 123; *Farmers' Bank of Delaware* v. *Beaston*, 7 Gill. & Johns., 422; *Murray* v. *Vanderbilt*, 37 Barb., 147; *Bissell* v. *Michigan Southern & Northern Indiana Railroad Company*, 22 N. Y., 268.)

We have examined the questions raised by the appeal, which affect the defendant Brainard, and think the judgment as to him should stand, for the reasons assigned in the court below.

The judgment should, therefore, be affirmed with costs, as to the defendant Brainard, and as to the defendant Van Santvoord, it should be reversed and a new trial ordered, with costs to abide the event.

All the judges concurring,

Judgment affirmed as to Brainard, and reversed as to Van Santvoord.